SAMSON and wife, Plaintiffs and Appellants, v. RIESING and others, Defendants and Respondents: WOOD, Defendant and Third-Party Plaintiff and Respondent: KOHL'S FOOD STORES, INC., Third-Party Defendant and Respondent.

*No. 233. Argued February 4, 1974.—Decided March 18, 1974.*
(Also reported in 215 N. W. 2d 662.)

702

For the appellants there was a brief by *Samson, Friebert, Sutton & Finerty* and *Robert E. Sutton,* all of Milwaukee, and oral argument by *Robert E. Sutton.*

For the respondents there was a brief by *Ames, Riordan, Crivello & Sullivan* and *Donald H. Carlson,* all of Milwaukee, and oral argument by *Mr. Carlson.*

HEFFERNAN, J. This case was decided by granting the motions of the defendants for a directed verdict. The trial judge did not permit the case to go to the jury; and following the decision on the motions, the jury was dismissed and judgment entered. The plaintiffs argued that the trial judge's order not only violated this court's standards for resolving a case on a motion for summary judgment but also followed a procedure which does not have the approval of this court.

We have admonished trial judges that, where there is a motion for directed verdict, it is the better practice to reserve the ruling on the motion and submit the matter to the jury. In the recent case of *Tombal v. Farmers Ins. Exchange* (1974), ante, p. 64, 214 N. W. 2d 291, we again cautioned trial judges that, in close cases, the procedure of reserving the ruling until after verdict ought to be followed. We quoted with approval *Flintrop v. Lefco* (1971), 52 Wis. 2d 244, 251, 190 N. W. 2d 140, where we said:

> " ' "It is to be regretted that the circuit court did not reserve its ruling on the motion for directed verdict until after the jury had returned its special verdict. By so doing, even though the court after the return of the verdict did see fit to have granted the motion, there would now be no necessity of granting a new trial. We do not advocate that such procedure invariably be followed, but in close cases we deem it to be preferable." *Davis v. Skille, supra,* 490.' "

As in this case, the appellants in *Tombal* argued that the admonition set forth above mandated trial judges

to follow those guidelines and in all cases to reserve rulings. We stress, however, that the guideline is an admonition only and is intended for application only in close cases. Where, as in this case, and as in *Tombal,* the trial judge after due consideration concludes that the case is not close, it is in the interest of judicial economy for a trial judge to rule immediately without letting the case go to the jury. There is substantial risk in deciding the motion for directed verdict immediately, for if this court reverses the judgment on the directed verdict, a remand for a jury trial becomes necessary and a whole new trial would usually be required. The decision to rule immediately, rather than to reserve a ruling, is a matter of judicial discretion, and we will not reverse merely because the trial judge did not follow the guidelines that are appropriate in a close case.

On appeal, the only question in respect to the directed verdict is whether the court erred in directing the verdict. The standards are the same whether the decision on the motion comes before or after a submission to the jury and whether the case was a close one or an easy one. The standard for determining whether the trial court erred in directing a verdict was stated in *Zillmer v. Miglautsch* (1967), 35 Wis. 2d 691, 699, 151 N. W. 2d 741:

"[T]his court must take that view of the evidence which is most favorable to the party (the plaintiff in this case) against whom the verdict was sought to be directed .... If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury. ... The weight and sufficiency of the evidence is for the jury ... as is the weight to be given to the witness' positive or negative testimony ... Furthermore, it is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury. ... If there is any evidence other than mere conjecture or incredible evidence to support

a contrary verdict, the case must go to the jury. . . . Incredible evidence is evidence in conflict with the uniform course of nature or with fully established or conceded facts. . . . [Citations omitted]"

Accordingly, in this case we must view the evidence most favorably to the plaintiffs; and if, under any possible theory of recovery, there is evidence to sustain the cause of action, the case must be submitted to the jury.

The plaintiffs' first cause of action is one for common-law negligence, that the defendants failed to take reasonable care in the preparation of food which they knew was to be consumed by persons attending the luncheon.

The Restatement, 2 *Torts* 2d, p. 149, sec. 328A, capsulizes the burden on a plaintiff to prove a cause of negligence:

"In an action for negligence the plaintiff has the burden of proving

"(a) facts which give rise to a legal duty on the part of the defendant to conform to the standard of conduct established by law for the protection of the plaintiff,

"(b) failure of the defendant to conform to the standard of conduct,

"(c) that such failure is a legal cause of the harm suffered by the plaintiff, and

"(d) that the plaintiff has in fact suffered harm of a kind legally compensable by damages."

In summary of the evidence which supports their position, plaintiffs state that it is undisputed that Pearl Samson contracted salmonella poisoning as the result of ingesting food which had been prepared by the defendants and purchased from them. Plaintiffs also point out that there was undisputed expert testimony that salmonella contamination would exist only if the turkeys were improperly cooked or the flesh contaminated by contact with salmonella bacteria after cooking. These facts, which are undisputed, the plaintiffs denominate as "elementary negligence," and they argue that, on the

basis of this evidence, the verdict ought to have been directed for the plaintiffs. From the plaintiffs' statement of the facts supporting their position, it is apparent that they have abandoned any attempt to prove element (b) set forth in the Restatement. They acknowledge that there is no direct proof of the "failure of the defendant to conform to the standard of conduct." This means that the plaintiffs are relying upon some unnamed theory of circumstantial evidence to prove their case.

Negligence can be proved circumstantially. The general rule, however, as stated in Prosser, *Torts* (hornbook series, 4th ed.), p. 211, sec. 39, is "that negligence must be proved, and never will be presumed." Prosser explains that statement (pp. 211, 212) by saying:

"What is required is evidence, which means some form of proof; and it must be evidence from which reasonable men may conclude that, upon the whole, it is more likely that the event was caused by negligence than that it was not. As long as the conclusion is a matter of mere speculation or conjecture . . . it becomes the duty of the court to direct the jury that the burden of proof has not been sustained."

Counsel for plaintiffs has attempted to assume the burden of proving circumstantially that someone was negligent. The facts stated in the plaintiffs' brief give rise to a reasonable inference that someone was negligent. That circumstantial proof, however, overlooks a crucial point, the *sine qua non* of liability, *i.e.,* that a particular defendant failed to conform to the standard of conduct.

The type of circumstantial proof upon which the plaintiffs would rely has been denominated in Wisconsin law as *res ipsa loquitur*. The elements of *res ipsa loquitur* as applied by this court have been stated in *Turtenwald v. Aetna Casualty & Surety Co.* (1972), 55 Wis. 2d 659, 665, 201 N. W. 2d 1:

"(1) The event or accident in question be of the kind which does not ordinarily occur in the absence of someone's negligence; and (2) the agency or instrumentality causing the harm must have been within the exclusive control of the defendant."

Some of the elements of *res ipsa* have been proved. The evidence leads to the conclusion that salmonella would not exist in the turkey salad without someone's negligence, but exclusive control in any one of the defendants or in the defendants collectively, on a theory of vicarious liability, has not been shown either by proof or by inference. Prosser, *supra,* points out, p. 218, sec. 39:

"It is never enough for the plaintiff to prove merely that he has been injured by the negligence of someone unidentified. Even though there is beyond all possible doubt negligence in the air, it is still necessary to bring it home to the defendant."

In this case nine turkeys were cooked, each by one of nine defendants, but not all of the 11 defendants cooked the turkeys. It does appear, however, that all of them participated in the preparation of the salad. Assuming that, at some stage of the preparation of one or more turkeys, one or more of the 11 ladies were negligent—either by providing inadequate cooking or inadequate refrigeration, or by permitting contamination from external sources—the negligence of any particular defendant remains completely a matter of speculation and conjecture. There was no exclusive control by any of the defendants. As Prosser, *supra,* stated, there is "negligence in the air," but it has not been laid at the doorstep of any defendant.

Even were we inferentially to narrow the negligence to the 11 defendants, the rule stated by Prosser is:

"[T]he plaintiff does not make out a preponderant case against either of two defendants by showing merely that he has been injured by the negligence of one or the other." (P. 221)

The problems raised by the joinder of multiple defendants in negligence actions is discussed by McCoid, *Negligence Actions Against Multiple Defendants,* in 7 Stanford Law Rev. (1955), 480, 487. The plaintiff's dilemma in respect to the element of control is discussed therein:

"Where there is but one defendant, the theory of 'control' as a question of probabilities has given little or no difficulty. But where there are two or more defendants, one of whom almost certainly negligently caused the plaintiff's injury but whose identity is uncertain, there may be serious question whether the element of 'control' can be found. Taking each individually, it may be impossible to say that it is more probable than not that he was negligent or the cause of the injury, although taking all the defendants together it is more probable than not that one was responsible for the injury."

This is the very situation in the instant case. Giving the greatest credence to the inference to be drawn by the facts set forth by the plaintiffs, that is all that is circumstantially proved. It is, however, an inference that leads nowhere, and under the rule from Prosser above, it is insufficient to impose liability. As the Stanford Law Review article points out, there may be circumstances in which the *res ipsa loquitur* doctrine can be used by a plaintiff to avoid a directed verdict if he can, in addition, spell out facts showing vicarious liability either under a theory of concerted action or *respondeat superior.* Unfortunately, the plaintiffs in their brief have failed even to refer to any facts by which any theory of vicarious liability could be supported, and no argument is made in terms of vicarious liability. To show vicarious liability as a result of concerted action, Prosser states:

"It is . . . essential that each particular defendant who is to be charged with responsibility shall be proceeding tortiously, which is to say with intent to commit a tort, or with negligence. One who innocently, and

carefully, does an act which furthers the tortious purpose of another is not acting in concert with him." Prosser, *Torts, supra*, p. 292, sec. 46.

Nor was there any proof, actually or circumstantially, of any circumstances that would show that one or more of the women were, on any theory, vicariously liable for the negligence of any one of them. The evidence fails to show that any of the several defendants had control over the work of the others.

There is no evidence that Dorothy Wood or Marjorie Borror had the necessary control over the operations that would establish vicarious liability. *See Bolen v. Bolen* (1968), 39 Wis. 2d 91, 94, 158 N. W. 2d 316; Restatement, 1 *Agency* 2d, p. 60, sec. 14; Seavey, *Agency*, p. 142, sec. 84. Nor has there been any showing that this was a joint enterprise. The elements of joint enterprise were set forth in *Edlebeck v. Hooten* (1963), 20 Wis. 2d 83, 89, 121 N. W. 2d 240. We stated therein, "A venture to constitute a joint adventure must be for profit in a financial or commercial sense." While it seems clear that the purpose of the luncheon was to secure funds to support the activities of the band, the venture does not come within the purview of "a special business arrangement . . . partaking of some essentials of a partnership." *Edlebeck*, page 87.

Vicarious liability, imputed negligence, and joint venture are essentially doctrines that are applicable to a situation where the negligence of one party is proved and it is sought to hold another party liable, either because, from a plaintiff's view, the other party is financially responsible or, from a defendant's view, to share the burden of the liability. None of these doctrines are of assistance to the plaintiffs in this case where the onus of negligent conduct has not been placed on any defendant.

Neither can we predicate liability upon a theory of implied warranty. The defendant relies upon two Wiscon-

sin cases. *Doherty v. S. S. Kresge Co.* (1938), 227 Wis. 661, 278 N. W. 437, and *Betehia v. Cape Cod Corp.* (1960), 10 Wis. 2d 323, 103 N. W. 2d 64. The *Doherty Case* was not decided on the basis of implied warranty, but upon negligence per se under the statutory standard set by the Minnesota law. It is not an implied warranty case. The *Betehia Case* is addressed to the question of implied warranty, but specifically holds that its ruling is confined to the situation where a patron orders and pays for a meal or food at a public restaurant.

The decision in *Betehia* is consistent with the Uniform Commercial Code, which provides in sec. 402.314 (1), Stats. 1967:

". . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a *merchant* with respect to goods of that kind." (Emphasis supplied.)

"Merchant" is defined in sec. 402.104 (1), Stats. 1967:

"[A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

A commercial restauranteur as in either *Betehia* or *Kresge* would fall within the definition of a merchant. Also, it should be noted that sec. 402.314 (1), Stats. 1967, imposes an implied warranty, not because of a sale alone, but because of the special responsibilities that are placed upon a merchant who is defined as one holding himself out as having knowledge and skill peculiar to the trade involved. The Wauwatosa Band Mothers, although selling the food, were not merchants as contemplated by the statute.

Neither are they subject to liability by virtue of sec. 402.315, Stats. 1967, which imposes an implied warranty

in instances where the seller's expertise is relied upon to furnish goods suitable for a particular purpose. *See Official UCC Comment No. 4*, 40A Wis. Stats. Annot., p. 200.

Since we find no warranty, it is irrelevant in this case that the plaintiffs failed to give notice of the breach of warranty required by sec. 402.607 (3) (a), Stats. 1967, but we point out that *Tews v. Marg* (1944), 246 Wis. 245, 249, 16 N. W. 2d 795, held implied warranties require the statutory notice of breach.

The plaintiffs also argue that, under the language of sec. 97.25, Stats. 1967, the conduct of the defendants constituted negligence per se. Sec. 97.25 provides in part:

"97.25 **Drugs and foods; adulteration.** (1) ADULTERA-TION. No person shall sell any drug or food which is adulterated.

"(2) FOOD. A food is adulterated: (a) If any substance or substances have been mixed with it, so as to lower or depreciate or injuriously affect its strength, quality or purity;

". . .

"(e) If it consists of or is manufactured, wholly or in part, from a diseased, contaminated, filthy, decomposed, tainted or rotten substance or any substance produced, prepared, packed, transported, or held under insanitary conditions whereby it may have been rendered unfit for food, or if it is any part of the product of a diseased animal, or the product of an animal that has died otherwise than by slaughter."

The plaintiffs argue that the food purchased by Pearl Samson was adulterated because it was contaminated with salmonella and, as a consequence, it was unfit for food. Accordingly, they contend the defendants have violated the standard of conduct prescribed by the statutes.

The statute in question is a part of the pure food laws of the state of Wisconsin set forth in ch. 97, Stats. 1967, under the caption, "Dairy, Foods and Drugs." Ch.

97 is a portion of Title XII of the statutes and concerns itself with agriculture, foods and drugs, and markets.

The trial judge concluded that statutory provisions of sec. 97.25, Stats., were inapplicable to this case because the pure food laws were intended to regulate businesses engaged in the manufacturing and processing of food and did not have the legislative purpose of regulating persons or organizations who sold food only occasionally.

This interpretation is borne out by the context of Title XII and ch. 97, Stats. 1967. They are food regulations, and the regulations are concerned exclusively with persons and firms who are in the course of business of supplying foods and drugs for market.

Sec. 97.022, Stats. 1967, authorizes the department of agriculture to establish regulations to implement the food laws set forth in the chapter and which will promote "honesty and fair dealing in the interest of consumers." The regulations by which it is contemplated the statute will be implemented are directed toward business practices. The rules and regulations as they have been promulgated in accordance with administrative procedures are limited to controlling commercial food manufacturers, retailers, and processors. See 1 Wisconsin Administrative Code, Department of Agriculture, Ch. AG 47, p. 131. There is nothing in the consistent administrative interpretation of the statute that indicates any legislative intent that the pure food laws be applicable to occasional sales that are not in the course of the operation of a business.

Prosser has stated, *Torts, supra,* page 191, where courts are considering whether a standard of conduct which is prescribed by the legislature should be adopted:

"[T]he courts are seeking, by something in the nature of judicial legislation, to further the ultimate policy for the protection of individuals which they find underlying the statute, and which they believe the legislature must have had in mind."

In *Gray v. Wisconsin Telephone Co.* (1966), 30 Wis. 2d 237, 245, 140 N. W. 2d 203, this court discussed the application of a statutory regulation in determining the standard of conduct in a tort case. We concluded that the Restatement, 2 *Torts* 2d, p. 37, sec. 288B:

". . . does not require that every violation of a statute is negligence *per se*. Sec. 286 of the Restatement, *supra*, discusses when the courts should adopt the legislation as defining a standard of conduct, at page 25:

" 'The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

" '(a) to protect a class of persons which includes the one whose interest is invaded, and

" '(b) to protect the particular interest which is invaded, and

" '(c) to protect that interest against the kind of harm which has resulted, and

" '(d) to protect that interest against the particular hazard from which the harm results.' "

Concededly, sec. 97.25, Stats. 1967, purports to protect persons from the hazards of unhealthful or contaminated foods. However, the whole tenor of the legislative enactment evinces a limitation of the class of persons who are intended to be protected and a limitation on the type of hazard from which they are to be protected. As we view the legislative intent, the purpose was to protect consumers in the commercial marketplace from the sale of adulterated and contaminated food by setting standards and regulations affecting commercial sellers of food— those persons who were in the regular course of business of selling food products. The Wauwatosa Band Mothers were not in that category. Even though there was testimony that the luncheon was an annual fund raising event, we see no evidence that there was a legislative intent to encompass within the scope of the regulatory scheme

such occasional sales, even though they were repeated at fairly regular intervals.

The question is: What type of conduct did the legislature intend to prohibit and arguably categorize as negligence. As Prosser states, *supra,* p. 195, sec. 36:

"The purpose of the legislation is of course a matter of interpretation of its terms, in the light of the evil to be remedied. The title, the provisions made and the language used, may indicate the object to be accomplished, and so no doubt may the records of the legislature itself."

There is no doubt in our mind, based upon careful examination of legislation and the administrative rules that have been promulgated pursuant thereto, that the legislature had no intent whatsoever to set standards that would affect anyone other than those in the food industry. The failure of a commercial seller to conform to the standards of sec. 97.25, Stats. 1967, would be negligence, but sec. 97.25 does not set a standard under which a judge or jury could find that the defendants in this case were negligent per se.

We have carefully examined every possible avenue by which the plaintiffs' case can be saved and have explored all theories under which it could reasonably be hoped to be argued that the case on the evidence as viewed in the light most favorable to the plaintiffs should have been submitted to the jury. We conclude that under no theory which has been suggested to us or arguably raised by the evidence at trial was a jury issue raised. The trial judge properly directed verdict for the defendants and dismissed the complaint.

*By the Court.*—Judgment affirmed.