LOCICERO, and others, Plaintiffs, v. INTERPACE CORPORATION, and another, Defendants-Respondents: WARD, and others, Defendants-Appellants.

*No. 75–814. Argued April 3, 1978.—Decided June 6, 1978.*
(Also reported in 266 N. W. 2d 423.)

For the appellants there were briefs by *Kurt H. Frauen, Michael J. Donovan,* and *Borgelt, Powell, Peterson & Frauen, S. C.,* and oral argument by *Kurt H. Frauen,* all of Milwaukee.

For the respondents there was a brief by *Foley & Capwell, S. C.,* and oral argument by *Rex Capwell,* all of Racine.

CALLOW, J.   The parties to this appeal are the defendants in a personal injury action. The action arose when the cargo of a flatbed trailer became unsecured, rolled into the oncoming lane of traffic, and collided with a van. The trailer was owned by Logan Trucking, Inc. The driver of the truck was William Ward, one of Logan's employees. At the time of the accident, Ward was transporting six cement sewer pipes manufactured

by Interpace Corporation to Kenosha. Each of the pipes was four feet in diameter, eight feet long, and weighed 7,000 pounds. The pipes were laid side by side, with the open ends facing the sides of the trailer, and were secured with 4 × 4 triangular chocks and a chain across the top of the pipes which was secured to a pipemaster at the rear of the trailer. As Ward started to descend a hill on Highway 50, near Slades Corners in Kenosha County, the load shifted and the pipes began to roll off the trailer. One of the pipes hit a van carrying seven painters employed by Ruffalo Decorating Company, Inc., to a job site. Two of the seven painters were killed, and the other five were seriously injured.

The five injured painters, their wives, and the two widows commenced actions against the hauler, Logan; the driver, Ward; the manufacturer, Interpace; and their insurers. All of the plaintiffs settled with Logan, Ward, and Logan's insurer their claims against all of the defendants. The aggregated settlement of these claims was $291,200. After the settlement, the only remaining issue was the contribution claim of Logan and its insurer. This claim was tried to a jury.

At the close of the evidence. Interpace moved for a directed verdict. The court took the motion under advisement and submitted the cause to the jury. The jury apportioned the negligence 55 percent to Interpace and 45 percent to Logan and Ward. Logan and Ward moved for judgment on the verdict, while Interpace renewed its motion for directed verdict and moved alternatively for judgment notwithstanding the verdict, or for a new trial. The court granted the motion of Interpace for a directed verdict on the grounds that there was no credible evidence that Interpace was causally negligent.

Logan, Ward, and Logan's insurer have appealed. Besides challenging the propriety of the directed verdict, Logan raises several issues concerning the liability of

Logan's insurer for Interpace's portion of the damages. Because the trial court held Interpace not negligent as a matter of law, it did not reach the insurance questions. Since we affirm the directed verdict, we do not reach the insurance questions either.

The pipe which injured the plaintiffs was loaded on the flatbed trailer by Interpace, with the supervision and assistance of Mr. Ward. Mr. Ward placed a 4 × 4 against the rear of the trailer. Then a forklift, operated by an employee of Interpace, placed the pipes side by side, forward from the 4 × 4. Mr. Ward placed a 4 × 4 in front of the row of pipes. He testified he normally put one or two extra 4 × 4's between the pipe. He then put two triangular solid wood chocks ahead of the front 4 × 4 and two behind the rear 4 × 4 and toenailed them to the wooden bed of the trailer. He secured the load by hooking two chains together, then onto a pipemaster, then lengthwise across the pipe to the front of the trailer and into a stake pocket. Mr. Ward used a chain binder to tighten the chain over the pipe so that there would be no movement in the load.

An added precaution to prevent the pipes from escaping would have been to chain through the center of some or all of the pipes. However, Mr. Ward did not chain through any of the pipes. He and Logan's officers testified that Interpace instructed Logan and its drivers not to chain through the pipe because chaining through the pipes damaged the ends of the pipe. Interpace officers denied that they forbade Logan from chaining through the pipes. They testified that Interpace merely instructed Logan not to chain the pipe in a manner that would damage the pipe. However, testimony was undisputed that if Logan drivers chained through the pipe and damaged it, Logan would have to pay Interpace for the damage done to the pipe.

Logan does not challenge the jury's finding that Logan was negligent in the manner in which it secured the

pipe. It does contend, however, that the jury properly found that Interpace was also negligent in instructing Logan not to chain through the pipes. Logan contends that a shipper can be held liable for requiring a carrier to use an unsafe method of securing the load and that there was credible evidence that the method required by Interpace in this case was unsafe.

A carrier such as Logan is bound to follow reasonable and lawful instructions given by the shipper whenever practicable. The carrier is liable to the shipper for loss or injury to the cargo resulting from a failure to follow shipping instructions. 13 Am. Jur.2d, *Carriers,* sec. 316 (1964); 13 C.J.S., *Carriers,* sec. 44 (1939). One who hires an independent contractor such as a motor carrier is liable for harm caused by an act or omission committed by the contractor pursuant to orders or directions that are negligently given. *United States Fidelity & Guaranty Co. v. Frantl Industries, Inc.,* 72 Wis.2d 478, 487, 241 N.W.2d 421 (1976) (employer's choice of materials in a construction project can make him liable for resulting harm); *Paulson v. Madison Newspapers,* 274 Wis. 355, 80 N.W.2d 421 (1957) (newspaper held liable for negligently ordering its carriers to drop papers in front of the post office where they are likely to be a hazard for pedestrians); *See also:* Restatement (Second) of *Torts,* sec. 410 (1966); Restatement (Second) of *Agency,* sec. 212 (1958). The liability involved is not imputed liability for the acts of another but is liability of the actor for his independent acts of negligence, *i.e.,* giving instructions that the actor can foresee are likely to cause harm to someone. Thus if Interpace instructed Logan not to chain through the pipe when it should have known this instruction would cause the load to be unsafe, then Interpace would be liable to the plaintiffs for the resulting harm.

Interpace contends that, despite these rules of liability, it cannot be held liable to the plaintiffs. Interpace relies on state statutes and federal regulations which impose an express duty on a carrier to secure all loads safely.[1] It argues that a shipper may not be held liable for breach of a duty which is by statute imposed exclusively on the carrier.

The federal safety regulations cited by Interpace have been issued by the Interstate Commerce Commission pursuant to the authority granted to the Commission by

---

[1] At the time this accident occurred, the following federal safety regulations applied: 49 C.F.R. sec. 292(a) & (b) (1968) stated:

"(a) Distribution and securing of load. No motor vehicle shall be driven nor shall any motor carrier permit or require any motor vehicle to be driven if it is so loaded, or if the load thereon is so improperly distributed or so inadequately secured, as to prevent its safe operation. (b) Doors, tarpaulins, tailgates and other equipment. No motor vehicle shall be driven unless the tailgate, tailboard, tarpaulins, doors, all equipment and rigging used in the operation of said vehicle, and all means of fastening the load, are securely in place."

49 C.F.R. sec. 296.4 (1968) stated: "No motor carrier shall permit or require a driver to drive any motor vehicle revealed by inspection or operation to be in such condition that its operation would be hazardous or likely to result in a breakdown of the vehicle nor shall any driver drive any motor vehicle which by reason of its mechanical condition is so imminently hazardous to operate as to be likely to cause an accident or a breakdown of the vehicle. If while any motor vehicle is being operated on a highway, it is discovered to be in such unsafe condition, it shall be continued in operation only to the nearest place where repairs can safely be effected, and even such operations shall be conducted only if it be less hazardous to the public than permitting the vehicle to remain on the highway."

49 C.F.R. sec. 293.85 (1968) stated: "Every motor vehicle carrying cargo, the nature of which is such that the shifting thereof due to rapid deceleration or accident would be likely to result in penetration of crushing of the driver's compartment must, in addition to have the load securely fastened or braced, be provided

49 U.S.C. sec. 304(a)(1) (1963). All interstate motor carriers must comply with these regulations. The federal courts have held that "[h]aving been made in pursuance of constitutional statutory authority, they have the same force as though prescribed in terms by the statute." *New Amsterdam Casualty Co. v. Novick Transfer Co.*, 274 F.2d 916, 919 (4th Cir. 1960); *Bussell v. Missouri Pacific Railroad Co.*, 376 S.W.2d 545 (Ark. 1964). They became part of the contract between the shipper and the carrier. *General Electric Company v. Moretz*, 270 F.2d 780, 787 (4th Cir. 1959).

In personal injury cases arising from accidents involving interstate carriers, the function of these regulations has varied depending on which law controls. In a jurisdiction where a violation of a safety statute is considered evidence of negligence, a violation of these regulations has been held to be evidence of negligence. *New Amsterdam Casualty Co. v. Novick Transfer Co., supra* at 923

---

with header boards or similar devices of sufficient strength to prevent such shifting and penetration. All motor vehicles shall be so constructed or be equipped with adequate cargo fastening devices so that the load will not penetrate the cargo compartment wall when subjected to the maximum braking deceleration of which the vehicle is capable."

Some of these regulations have since been revised and now include elaborate rules for protecting against shifting and falling cargo. *See:* 49 C.F.R. sec. 392.9 and 393.100–106 (1976).

In addition to the federal regulations, secs. 348.10(2) and (5) (a), Stats., states: "(2) No person shall operate a vehicle on a highway unless such vehicle is so constructed and loaded as to prevent its contents from dropping, sifting, leaking or otherwise escaping therefrom." "(5) The load imposed upon trailers or semitrailers shall be distributed in a manner that will prevent side sway under all conditions of operation: (a) All items of load carried by any trailer, semitrailer or mobile home, except bulk material such as sand, gravel, dirt not in containers, shall be secured to, on or in the trailer in such manner as to prevent shifting of the load while the trailer or mobile home is being drawn by a towing vehicle."

(Maryland law applied); *Interstate Motor Lines, Inc. v. Great Western Railway Co.,* 161 F.2d 968 (10th Cir. 1947) (Colorado law applied).

In a jurisdiction which permits one tortfeasor to obtain indemnity from another tortfeasor who is primarily liable for the harm, a court has held that ICC safety regulations make a carrier primarily liable for the safe loading of cargo as against other negligent parties. *United States v. Savage Truck Line, Inc.,* 209 F.2d 442 (4th Cir. 1953) (Virginia law applied). In *Savage* the court required a carrier who violated federal safety regulations to indemnify a shipper who was also held liable for damages resulting from the transportation of an unsafe load. *Savage* illustrates that motor carrier safety regulations impose a clear duty on the carrier to secure the load safely but that they do not relieve other parties, such as the shipper, from common law or contractual liability for causing an unsafe load. These cases suggest that violations of ICC regulations are to be treated in the same manner that violations of other safety statutes are treated in that jurisdiction.

In Wisconsin a violation of a safety statute is ordinarily negligence per se. *Fleury v. Wentorf,* 82 Wis. 105, 262 N.W.2d 68 (1978). *Meihost v. Meihost,* 29 Wis.2d 537, 139 N.W.2d 116 (1966). Under our comparative negligence statute, the jury weighs and apportions the negligence of all of those whose negligence was a substantial factor in causing the harm, even though the negligence of one tortfeasor may be statutory while another may be common law. *Reddington v. Beefeaters Tables, Inc.,* 72 Wis.2d 119, 240 N.W.2d 363 (1976). The negligence of one tortfeasor may be established by proof of a breach of safety regulations, such as sec. 348.10, Stats., and 49 C.F.R. 292.9 (1968), while the negligence of another may be established by proof of a breach of the

common law duty of ordinary care. We hold that sec. 348.10, Stats., and the federal safety regulations impose a clear statutory duty on the carrier to secure the load safely, but they do not relieve those who breach a common law duty of care from liability for their negligence and their comparative share of the resulting damages.

Interpace next argues that Logan's breach of its statutory duty to load the trailer securely is an intervening cause which supersedes the common law negligence of Interpace in requiring Logan to use an unsafe method of securing the load. However, we do not decide whether Logan's negligence is a supervening cause because we affirm the trial court's conclusion that upon the evidence adduced as a matter of law Interpace was not negligent.

For the jury to have found Interpace negligent, there must be some credible evidence that Interpace knowingly required Logan to use an unsafe method of securing the load. We must scrutinize the evidence in the light most favorable to the verdict. *Thompson v. Howe,* 77 Wis.2d 441, 448, 253 N.W.2d 59 (1977); *Samson v. Riesing,* 62 Wis.2d 698, 705, 215 N.W.2d 662 (1974). If there is any credible evidence that Interpace knowingly required Logan to use an unsafe method to secure the load, the jury's verdict must be reinstated. *Zillmer v. Miglautsch,* 35 Wis.2d 691, 699, 151 N.W.2d 741 (1967); *Samson v. Riesing, supra.* Only if the evidence was undisputed or where there was but one inference to be reached by a reasonable person was the verdict properly directed by the trial court. *Tombal v. Farmers Insurance Exchange,* 62 Wis.2d 64, 68, 214 N.W.2d 291 (1974).

Mr. Ward testified that he loaded his trailer the day before the accident at Interpace headquarters in South Beloit, Illinois. On direct examination he testified that in securing the load he nailed the chock blocks to the trailer bed, but he did not testify that he nailed the

4 × 4's to the bed as well. On cross-examination he stated that he did not recall nailing the 4 × 4's to the bed, though he admitted that he testified in a deposition that he nailed them down. He testified that the 4 × 4's were not necessarily nailed to the trailer bed in the loading process.

He drove to the Illinois-Wisconsin line before stopping overnight. Before starting out the next morning, he inspected the tires and chains, hit the blocks to make sure the load was secure, and found everything to be in order. He made a stop in Clinton, Wisconsin, approximately 22 to 24 miles before the accident, again inspected the load, and found it to be in order. At the time of the accident, he was traveling east on Highway 50 at approximately 40 to 45 miles per hour. As he was coming out of a right-hand curve at the crest of a hill, he felt the load shift. He looked in the left-rearview mirror and saw several pipes coming off the trailer "like a deck of cards from the rear first and then sideways." He saw one of the pipes hit the van. Approximately a half hour after the accident, he checked the trailer and found that one pipe was left on the trailer, that the chain was not broken, that the chain was attached at both ends, and that the load binder was secure. He did not recall seeing the 4 × 4 that had originally been placed to the rear of the last pipe.

The deposition of Grace McCurdy was read into the record. Mrs. McCurdy was driving to work behind Mr. Ward's trailer and witnessed the accident from a vantage point two or three car lengths behind the trailer. She testified that just at the top of the hill, the chain on the truck broke or came loose and flew straight up in the air approximately ten feet. After the chain flew into the air, the back pipe immediately fell off. Mrs. McCurdy did not recall any wooden blocking to the rear of the last pipe. The pipe rolled down the road, and the second pipe rolled

off the side or the back of the trailer and hit the Ruffalo van.

Deputy Walter Gayan of the Kenosha Sheriff's Department arrived at the scene five or ten minutes after the accident occurred. He testified that Mr. Ward told him he lost one of the wooden supports before the accident and that this was why the pipes escaped. Mr. Ward, however, denied making such an admission. Deputy Gayan examined the trailer one or two hours after the accident. He observed some wooden chocks and 4 × 4's on the truck. The chain appeared to be securely fastened and undamaged.

James R. Logan testified that he has been the general manager of Logan Trucking for fifteen years. He testified that Interpace employees set the pipe on the trailer, while the Logan driver secured the load. The manner in which Mr. Ward secured the load was the practice used by Logan at that time. Mr. Logan testified it was essential to the safety of the load that the 4 × 4's remain secure. If the 4 × 4's remained in place, he believed you could transport the pipe safely without the chain across the top at all. According to Mr. Logan, the method of securing the pipe by loading the pipe touching each other, with 4 × 4's front and back snuggly up against the pipe, with chock blocks of wood placed and toenailed to the trailer bed was the common, ordinary, and accepted manner in which loads of this type were transported. He felt that the way in which his company's loads were secured was safe. He did not know of any way that this pipe, if it had been properly loaded, might have escaped this flatbed. However, he also stated that the load would be safer if it were chained through the pipe and that the safest way is to chain through the pipe. He admitted that after the accident Logan always chained through the pipes, and that at the time of the accident chaining through the pipes was the standard method in the industry.

Professor Archie Easton, an accident reconstruction engineer, testified in behalf of Interpace. Professor Easton testified that the pipes escaped because the 4 × 4 at the rear of the trailer was lost. According to Professor Easton, the 4 × 4 could not have left the flatbed if it had been nailed down. He stated that the 4 × 4 could also have worked its way loose if it was not set tightly against the last pipe. Professor Easton's opinion was that, if Grace McCurdy testified correctly that the chain flew ten feet into the air, then the chain either broke or became unfastened from the pipemaster.

Professor Easton testified further that loading a trailer of cement pipe in the manner used by Logan in this case is "one method of securely loading the tile," but that it was important that each tile touch each other, that the front and rear tile be in physical contact with the 4 × 4's, and that the 4 × 4's themselves be spiked. Professor Easton testified that to a reasonable degree of mechanical engineering probability that the method used by Logan, if properly carried out, is safe and that the truck could surmount a 60 percent grade before one pipe would roll over the 4 × 4, even without a chain over the pipes. Professor Easton stated that, based on his analysis of the applicable coefficient of friction, if properly executed, the method used by Logan would not result in direct side movement of the pipes unless the truck rounded a curve at 95 miles per hour. However, Professor Easton stated that, once freed, the pipes could swivel sideways as they rolled backwards, as he believed they did in this case. Professor Easton admitted that, if the pipes were secured by chains through the center, they couldn't possibly slide sideways and that if the pipes had been chained through the center, the accident would not have occurred; but he also stated that the method used by Logan was standard in the industry and was safe.

Interpace introduced deposition testimony of Raymond Brandt, a health and safety consultant, who has had wide

experience with the transportation of heavy machinery and materials on flatbed trailers. Mr. Brandt testified that he has seen pipe such as that involved in this case transported with and without chains through the center. He has recommended chaining over the pipes and, depending on the circumstances, chaining through all, some, or none of the pipes. He testified that, under the circumstances of this particular load, distance and terrain, he would recommend a tiedown across the top and the use of wood chocks as was done in this case.

Joseph Kniffin, an Interpace supervisor, testified chaining through the pipe provided added protection in case the other blocking would fail. John Vandervont, an Interpace driver, testified that it was very seldom that Interpace did not put any chains through the pipes when it transported its own pipe. However, Robert Mabie, who loads pipe for Interpace, testified that in 1968 Interpace chained only over the top. Ed Dunham, an Interpace driver, testified that he generally chained through the front and back pipe as well as over the top. He also stated that damaging pipes by chaining through was a risk one had to take—it was either damaging the pipes or having them fall off the trailer.

This summary of the evidence shows that there was testimony that securing the load without chaining through the pipe was not the safest alternative but that there was no testimony that chaining over the load was inherently unsafe. On the contrary, two experts testified that, assuming the pipes were properly braced by the $4 \times 4$'s and the wooden chocks, chaining over the load was a safe method to use. Logan's own vice president testified that chaining through the pipe was "safer" but that chaining over the pipe was "safe."

Logan points to the testimony of Interpace driver Ed Dunham, who stated that the choice was either to damage the pipes or risk having them fall off the trailer. How-

ever, according to the other witnesses, including two experts in the highway safety field, the risk referred to by Dunham was remote and therefore not unreasonable. These witnesses testified that chaining over the pipes, if properly done, was not a hazardous method of securing this load. We do not believe that the testimony of one Interpace driver, that the choice was either damage the pipe or risk having them roll into the road, in light of the other evidence, that if properly executed, it was safe to chain over the top, is sufficient to permit a reasonable inference that chaining over the pipes is inherently unsafe.

The other evidence cited by Logan in support of the jury's verdict is the evidence showing that chaining over the pipes was the more hazardous of the two alternatives. But this court has called it "boiler-plate law" that, merely because a product or an operation is not as safe as possible, because there are better methods of manufacture or performing an operation does not lead to the conclusion that the method employed was undertaken with a lack of ordinary care. *Greiten v. La Dow,* 70 Wis.2d 589, 602, 235 N.W.2d 677 (1975). In addition, this court has held that "[g]enerally, one is negligent in selecting the more dangerous route only when he knows or should know it to be unsafe." *Grube v. Moths,* 56 Wis.2d 424, 434, 202 N.W.2d 261 (1972). According to the contract between the parties, Interpace specified the manner in which the chains should be placed, but Logan was responsible for seeing that the load so chained was otherwise properly secured.

Professor Easton testified that, if the 4 × 4 had been properly positioned and nailed and if the chain did not break or become unfastened from the pipemaster, the load would have remained secure. Viewing the evidence in the light most favorable to the verdict, there is no

credible evidence in the record that contradicts his testimony. On the contrary, the evidence showed that either the chain loosened or broke or the $4 \times 4$ worked itself free. In either case it was Logan and not Interpace that breached its duty of care. We hold that the only reasonable conclusion to be drawn from this evidence is that Interpace was not causally negligent in directing Logan to use one of two alternative safe methods and secure the pipe. We affirm the directed verdict in favor of Interpace.

*By the Court.*—Judgment affirmed.