**Edward A. LENO, Plaintiff and Appellee,**

v.

**Martin EHLI and Mary Ehli, Defendants,**

**and**

**Melvin Felchle, Defendant and Appellant.**

**Civ. No. 10417.**

Supreme Court of North Dakota.

Oct. 12, 1983.

---

* Justice WM. L. PAULSON served as a Surrogate Judge for this case pursuant to Section

27–17–03, N.D.C.C.

Frederick E. Saefke, Jr., Bismarck, for plaintiff and appellee; argued by Frederick E. Saefke, Jr.

Fleck, Mather, Strutz & Mayer, Bismarck, for defendant and appellant; argued by Steven A. Storslee, Bismarck.

ERICKSTAD, Chief Justice.

Melvin Felchle appeals from a judgment of the District Court of Burleigh County which awarded Edward A. Leno the sum of $16,119.85 in damages, costs, and disbursements in a negligence action. We affirm.

The record reflects that Leno, the plaintiff in this case, was hospitalized from February 10 through February 25, 1982, for the treatment of salmonella food poisoning. On January 30, 1982, Leno and his wife attended a party which was put on by the Bismarck Expos, an organization of former Bismarck law enforcement personnel. The menu for the affair, which was held at the police department pistol range, included potato salad, cole slaw, baked beans, and smoked turkey.

The turkeys were purchased by the Expos, and defendant Felchle and Gordon Kern, another member of the organization, assumed the responsibility of obtaining and preparing them for consumption. Felchle acquired six frozen turkeys, each weighing between 20 and 23 pounds, from a Bismarck grocery store. He subsequently delivered them on January 16, 1982, to Frosted Foods, Inc., a meat processing business in Bismarck, where they were cured and smoked. On January 25, 1982, the turkeys were returned to Kern and Felchle. Felchle and Kern each took one of the turkeys to their respective homes to cook them for the party. The remaining four turkeys were delivered to the home of defendants Martin and Mary Ehli for preparation.

On the day of the party, Felchle and Kern went to the pistol range early in the afternoon to begin carving the turkeys. Felchle's turkey was the first carved. Soon afterward, Martin Ehli brought the four turkeys his wife had cooked and they were carved by Felchle and Kern. Kern's turkey was not yet ready for serving, so it was not carved at that time, but was placed in an oven at the pistol range.

Pieces of the Felchle turkey and Ehli turkeys were placed and mixed together in three boxes lined with tin foil. Later that afternoon, other members of the organization began to arrive with additional food. The meal was served in a buffet fashion during the evening. Approximately 50 people attended the party at one time or another. Kern's turkey was not carved until later in the evening after most of the people had left. The remaining pieces of the Felchle and Ehli turkeys were given to the Sheriff's Department after the party. The persons who cleaned up the pistol range the following morning took the Kern turkey to the Police Department.

During the ensuing days, 18 people who had attended the party, including Leno and his wife, became ill. Leno was diagnosed as suffering from an infection of salmonella enteritidis serotype Chester, a relatively rare strain of subspecies that is most frequently associated with poultry.

Samples of the food served at the party were analyzed by the North Dakota State Department of Health. The laboratory reports revealed that the samples of potato salad and cole slaw tested negative for salmonella. Samples of the remainder of the Felchle and Ehli turkeys and tin foil taken from the Sheriff's Department also tested

negative for salmonella. However, samples of the Kern turkey, turkey bones, and tin foil taken from the Police Department tested positive for salmonella enteritidis serotype Chester.

In a complaint dated June 4, 1982, Leno brought suit against Felchle and the Ehlis alleging in part that he had eaten turkey prepared by the defendants and that his injuries were the "direct and proximate result of the defendants' negligence in serving . . . food which defendants knew, or in the exercise of reasonable care should have known, was not wholesome and fit for human consumption." The case was tried to the court without a jury on January 20 and 21, 1983.

In a memorandum decision dated January 25, 1983, the trial court concluded that neither of the Ehlis were responsible for Leno's illness, but found Felchle solely responsible. The court noted that although the fact that Kern's turkey was the only turkey that tested positive for salmonella might indicate that it was the only contaminated turkey, "the evidence is plainly to the contrary, since . . . most of the people who contracted salmonellosis, including the plaintiff and his wife, did not eat from the Kern turkey but from the other turkeys."

The court then proceeded to examine the turkey preparation activities of the defendants. The court found no negligence in the preparation activities of the Ehlis or Kern. However, the court determined that Felchle had failed to properly prepare his turkey, and as a result, "[t]he existence of poisonous numbers of salmonella at the time the food was eaten was . . . predictable."

Judgment was entered on January 31, 1983, and Felchle appeals. Felchle's major contention is that the evidence is insufficient to sustain the judgment. More specifically, he argues that the trial court erred in denying his motion for dismissal at the close of the plaintiff's case pursuant to Rule 41(b) of the North Dakota Rules of Civil Procedure, and in the alternative, that the findings of the trial court are clearly erroneous under Rule 52(a), N.D.R.Civ.P.

Felchle contends that the trial court, in arriving at its final decision, "relied heavily" on evidence introduced by the plaintiff after it had denied his motion for dismissal. The determination of this issue requires that we examine the events which occurred during the trial.

After the plaintiff rested his case at the end of the day on January 20, 1983, Felchle and the Ehlis moved to dismiss. Following arguments by counsel, the trial court denied the motions. The court then recessed until the following morning for the presentation of defense testimony. On January 21, 1983, Felchle's counsel and counsel for the Ehlis told the trial court that after reconsidering they had decided not to present any defense testimony and rested. Plaintiff's counsel, who had subpoenaed rebuttal witness, then moved to reopen the case for the presentation of additional testimony "for clarification of the record." The trial court heard arguments on the motion and then allowed the plaintiff to reopen his case. Following the plaintiff's presentation of additional evidence, the defendants once again rested without presenting any evidence and renewed their motions for dismissal, which were denied.

Felchle argues that our Court is limited to considering only the evidence submitted by the plaintiff at the time Felchle's first Rule 41(b) motion to dismiss was denied, which occurred before the plaintiff was allowed to reopen his case. We believe Felchle's argument would more appropriately be that the trial court abused its discretion in allowing the plaintiff to reopen his case because once the trial court granted the plaintiff's motion to reopen and present additional evidence in his case in chief, the propriety of the trial court's ruling on the first Rule 41(b) motion was rendered moot.

It has been held that a trial court is not prohibited from reopening, but in its discretion may reopen a case after motions for dismissal in a bench trial, or for a directed verdict in a jury trial, have been either sustained or denied. *See, e.g., McCullough v. Leftwich,* 232 Ark. 99, 102, 334 S.W.2d

707, 709 (1960); *Community Education Center, Inc. v. Cohen,* 151 Ga.App. 77, 78, 258 S.E.2d 742, 743 (1979); *Serijanian v. Associated Material and Supply Co.,* 7 Mich.App. 275, 279–282, 151 N.W.2d 345, 347–348 (1967); *Nelson v. Home Ins. Co.,* 353 So.2d 763, 765–766 (Miss.1977); *Moss v. Greyhound Lines, Inc.,* 607 S.W.2d 192, 195–196 (Mo.App.1980); *Conley v. Dee,* 246 S.W.2d 385, 387 (Mo.App.1952). Our Court has stated on several occasions that trial courts are vested with broad discretion in permitting or refusing to permit a party, after having rested, to reopen the case for the purpose of introducing additional proof, and thus the trial court's decision will not be reversed on appeal absent a showing that such discretion was clearly abused. *Foerster v. Fischbach-Moore, Inc.,* 178 N.W.2d 258, 264 (N.D.1970); *Kuntz v. Stelmachuk,* 136 N.W.2d 810, 818 (N.D.1965); *Liberty National Bank of Dickinson v. Daly,* 96 N.W.2d 897, 899 (N.D.1959); *Fried v. Olsen,* 22 N.D. 381, 385, 133 N.W. 1041, 1043 (1911).

Felchle has neither contended, nor shown that he was prejudiced in any way as a result of the trial court's decision to reopen. Upon the record before us, the trial court did not abuse its discretion in allowing the plaintiff to reopen his case.

■ We next turn to Felchle's major contention that the evidence was insufficient to sustain the judgment. At the outset, a brief discussion of the general principles governing the burden of proof in negligence actions is appropriate.

We have defined "actionable negligence" as "the existence of a duty or obligation on the part of one to protect another from injury, the failure to discharge that duty, and the resulting injury to the other proximately caused by the breach of duty." *Carlson Homes, Inc. v. Messmer,* 307 N.W.2d 564, 566 (N.D.1981). *See also, Brauer v. James J. Igoe & Sons Construction, Inc.,* 186 N.W.2d 459, 468 (N.D.1971). In a negligence action, the plaintiff has the burden of proving by a preponderance of the evidence that the defendant was responsible for some negligent act or omission, and that such act or omission was the proximate cause of the plaintiff's injuries and damages. *Bismarck Baptist Church v. Wiedemann Indus., Inc.,* 201 N.W.2d 434, 440 (N.D.1972).

■ Furthermore, it is well settled that the mere fact an injury has occurred, without more, is not evidence of negligence on the part of anyone; rather, such negligence must be affirmatively established. *Northwestern Equipment, Inc. v. Cudmore,* 312 N.W.2d 347, 352 (N.D.1981); *Anderson v. Kroh,* 301 N.W.2d 359, 362 (N.D.1980); *Bismarck Baptist Church, supra;* Prosser, Law of Torts § 39, at 211 (4th ed. 1971). However, proximate cause may be proved by the circumstances of a case if such circumstances permit a reasonable inference of a cause of injury for which the defendant is responsible, and at the same time exclude equally reasonable inferences of other causes for which the defendant is not responsible. *Bismarck Baptist Church, supra.*

■ Generally, the existence of negligence and proximate cause are fact questions, unless the evidence is such that reasonable minds can draw but one conclusion therefrom. *Northwestern Equipment, Inc., supra; Carlson Homes, Inc., supra.* Thus, unless the evidence is such that reasonable minds could come to but one conclusion, the trier of fact must weigh the evidence and determine whether or not the plaintiff has met the burden of persuasion that the defendant was negligent and that such negligence was the proximate cause of the damages incurred. *F–M Potatoes, Inc. v. Suda,* 259 N.W.2d 487, 491 (N.D.1977).

■ A trial court's findings of fact, which are given the same weight as a jury verdict, will not be set aside on appeal unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Bye v. Elvick,* 336 N.W.2d 106, 112 (N.D.1983). We have previously stated that a finding is clearly erroneous only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Northwestern Equipment, Inc., su-*

*pra.* Thus, a finding is not clearly erroneous under Rule 52(a) merely because we might have reached a different result had we tried the case. *Bye, supra.* In determining the sufficiency of the evidence to sustain the trial court's findings, the evidence must be viewed in the light most favorable to the findings. *Eakman v. Robb,* 237 N.W.2d 423, 429 (N.D.1975).

With the foregoing principles in mind, we proceed to review the evidence presented during the trial.

Dr. John Carson, a specialist in infectious diseases, testified that turkeys can become infected with salmonella in two different ways. The turkey can carry salmonella in its digestive tract as a primary pathogen from the time it is raised by the producer. According to Dr. Carson, anywhere from one percent to fifty percent of all raw meats sold at retail outlets contain salmonella as a primary pathogen. He also testified that the number one carrier of salmonella as a primary pathogen is poultry. A turkey free of infection with salmonella as a primary pathogen, however, can become infected from outside sources through cross-contamination by contact with people carrying the organism, contaminated objects, or other contaminated fowl.

Dr. Carson testified that salmonella multiply geometrically at temperatures between 40 degrees and 140 degrees Fahrenheit, with the ideal breeding temperature being about 99 degrees. He also testified, however, that salmonella will be killed by bringing the internal temperature of the meat to 140 degrees. A.A. Gustafson, the chief of laboratory services for the State Department of Health, testified that the internal temperature of the meat must reach 165 degrees. Gustafson also testified that this internal temperature must be maintained for "as much as one hour" in order to kill the organisms. The testimony also established that once the poultry is freed of salmonella through proper cooking, salmonella will not spontaneously reoccur unless the meat is reinfected by another source. Dr. Carson testified that it was impossible to directly determine under the facts of this case which, if any, of the turkeys carried salmonella as a primary pathogen.

Initially, Felchle seems to claim that the results of the laboratory tests conducted by the State Department of Health clearly established that Felchle could not be found liable. As noted earlier herein, only the Kern turkey tested positive for the presence of salmonella. The remaining portions of the Ehli and Felchle turkeys which were tested showed no presence of salmonella.

As puzzling as this may seem, upon reviewing the evidence in this case, we do not believe it posed a bar against finding Felchle liable. In response to a question by the trial judge, Gustafson testified:

"Just because we examined a sample of turkey and got a negative does not mean that the turkey was not infected. We may not have gotten a sample from an infected portion of it."

In view of the evidence that the plaintiff and most of the others who contracted salmonella had not eaten from the Kern turkey, we cannot say that the trial court's finding in this regard is clearly erroneous.

Felchle also contends that there is "absolutely no evidence, either in the form of expert opinion or otherwise," to support the conclusion that the turkey he prepared was contaminated with salmonella as a primary pathogen. He argues that this determination was critical in this case because the expert testimony established that if a turkey does not carry salmonella as a primary pathogen, the temperature reached in the cooking process, and thus the method in which he prepared the turkey, becomes irrelevant in regard to salmonella food poisoning.

Indeed, as Felchle points out, Dr. Carson testified that it was not possible to positively determine if the turkeys in this case carried salmonella as a primary pathogen without tests having been conducted prior to their being cooked. However, we do not believe this was fatal to the plaintiff's case. Although there was no direct evidence that Felchle's turkey was so infected, the circumstances in the instant case permit a

reasonable inference that Felchle's turkey did carry salmonella as a primary pathogen.

The testimony established that it is common for turkeys to be infected with salmonella. Furthermore, the evidence sufficiently ruled out the possibility of any form of cross-contamination[1] or that the plaintiff or others who became ill had consumed meat from the Kern turkey. Evidence was also presented indicating that Mary Ehli prepared and cooked her turkeys in such a manner that, even if salmonella initially existed in her turkeys, the bacteria would not have survived. On the other hand, the evidence indicates that Felchle's activities in preparing and cooking his turkey were such that the salmonella would have survived.

Felchle testified that he obtained his turkey on January 25, 1982, and placed it on an unheated patio. He left the turkey there until January 27, 1982. At approximately 9 a.m. that morning, Felchle brought the turkey, which he described as "frozen," into the house and allowed it to thaw at room temperature for three hours. He further testified that at noon he placed the turkey in an oven preheated to 400 degrees, which he then increased to 425 degrees, and left it until 3:30 p.m. He then increased the temperature to 450 degrees until 4:30 p.m., at which time, Felchle testified, an automatic thermometer which had been placed in the breast of the turkey "popped out." He then turned the oven off, left the oven door slightly open, and left the turkey in the cooling oven until he returned home at 10:30 p.m. Felchle, who testified that this was the first turkey he had ever cooked, stated that he then removed the turkey from the oven and placed it on the patio where it remained until the party.

On the morning of the party, Felchle removed the turkey from the patio and placed it in his kitchen to thaw. Felchle

also testified that he cut a portion of the turkey and left it in the refrigerator at his home. He testified that although he became ill after the party, he did not get sick after he had eaten the turkey he kept refrigerated in his home.

Mary Ehli testified that she stored the four turkeys she prepared in the family's unheated garage. She testified that she brought the turkeys into the kitchen one at a time and cooked them during a two-day period. She further testified that the turkeys were only "partially" frozen when she took them from the garage, and she allowed each turkey to thaw in water for approximately one hour until she could remove the neck, liver, and gizzard inside of them. Ehli stated that she placed the turkey in an oven preheated to 375 degrees and cooked them for four hours—one hour at 375 degrees and the remainder of the time at 350 degrees until the automatic thermometer "popped up." After the termometers "popped up," she left the turkeys in the oven for another 15 to 20 minutes at 350 degrees. She then allowed the turkeys to cool on a cookie tin until she "could handle it," and placed the turkeys in the garage. Neither of the Ehlis became ill after eating turkey they had kept for home consumption.

Although Dr. Carson and Gustafson did not testify as to the specific oven temperature and cooking time required to kill salmonella in a turkey, Gustafson testified that in order to avoid contamination, a consumer "has to follow explicitly the directions or the manufacturer's label." Dr. Carson indicated that a person cooking poultry could rely on whether or not the meat was "well done." According to a turkey recipe booklet that was entered in evidence,[2] a frozen turkey thaws at room temperature approximately one hour for

---

1. As the trial court noted, the evidence showed that normal precautions were taken in the care and use of utensils in preparing and cutting the meat, that no one involved contracted food poisoning on any occasion at or near the time of the party, that no one else using the premises during this period of time experienced any

similar difficulties, and that the pistol range is made of concrete and steel and had experienced no problem with rodents.

2. It is unclear whether or not Felchle's turkey was accompanied with these, or any other instructions.

each pound. The booklet further states that a thawed, unstuffed, 20-pound turkey requires approximately five and three-quarter hours of cooking time in a preheated oven at 325 degrees. Testimony in the instant case reveals that the turkeys were smoked for 24 hours at a temperature of 140 degrees, and that this process reduces by one half the necessary cooking time.

█ Felchle argues that the foregoing evidence was insufficient to establish that the salmonella were not destroyed by his preparation of the turkey. He contends that although the trial court's opinion rests largely upon the fact that Felchle did not adequately thaw his turkey and thus the meat did not reach the temperature required to kill salmonella, there was no testimony regarding the proper procedures for thawing a smoked turkey. He also urges that expert testimony was required to establish whether or not Felchle's preparation of the turkey was sufficient to kill salmonella.

Under the circumstances of this case, we do not believe expert testimony was required to establish this fact. We take judicial notice that people have been cooking and eating poultry for hundreds of years, presumably without knowing the exact temperature and amount of cooking time required to eliminate salmonella bacteria which may be present in the meat. Even without such knowledge, salmonella food poisoning has not proven to be the natural consequence of consuming poultry. We thus think it is common knowledge that there is a danger of illness from eating poultry which has not been properly prepared. In sum, we cannot say that whether or not a smoked turkey has been properly thawed and cooked to insure that persons who subsequently eat from it will not become ill is beyond the area of common knowledge or lay comprehension.

We agree with the following observations of the trial court:

"The turkey prepared by Mr. Felchle weighed at least 20 pounds, but he allowed it to thaw at room temperature only three hours. The cooking times and temperatures referred to earlier assume a turkey which has been thawed. Mr. Felchle was cooking an unthawed turkey for a length of time that was, at best, minimal for even a fully thawed turkey. Mr. Felchle then let the turkey sit for several hours in a perfect incubator for salmonella.

\*　　\*　　\*　　\*　　\*　　\*

"Mr. Felchle was not required to know the nature and characteristics of salmonella. He was under a duty as a prudent person to undertake to learn the proper method of caring for and preparing turkey if he was going to provide it to others. It is clear from the testimony that Mr. Felchle did not know of any precautions that should be taken or, if he did know, he failed to take them. The existence of poisonous numbers of salmonella at the time the food was eaten was, therefore, predictable."

█ Felchle also points to the testimony of various witnesses, including himself, who stated that the meat on Felchle's turkey appeared to be adequately cooked. However, a trial court is not bound to accept as the truth the testimony of a witness, and where the trial court chooses between two permissible views of the weight of the evidence, its decision on the matter is not clearly erroneous. *In Re Estate of Elmer,* 210 N.W.2d 815, 820 (N.D.1973).

Felchle relies upon the Wisconsin Supreme Court's decision in *Samson v. Riesing,* 62 Wis.2d 698, 215 N.W.2d 662 (1974), which contains facts which are somewhat analogous to the case at bar. In *Samson,* the plaintiff, who had contracted salmonella food poisoning after eating turkey salad that was served at a luncheon sponsored by a high school band mothers association, brought suit against 11 members of the association who had assisted in the preparation of the contaminated turkey salad alleging, *inter alia,* that the defendants were negligent in preparing and serving the food. The court affirmed the trial court's granting of a directed verdict in favor of the defendants, noting that "there is 'negli-

gence in the air,' but it has not been laid at the doorstep of any defendant." *Samson, supra,* 62 Wis.2d at 708, 215 N.W.2d at 668.

*Samson* is distinguishable from the instant case because it appears from the facts of that case that the activities of the individual defendants in the preparation and cooking of their respective turkeys, and the making of the turkey salad, was all the same. Thus, although negligence may have existed, there was no way of determining who was responsible for it. In the instant case, the record reveals that Felchle and the Ehlis prepared and cooked their turkeys differently and that Felchle did so in a negligent manner.

▪ Finally, Felchle claims that nothing in the record indicates that the turkey actually eaten by the plaintiff was prepared by him. However, we believe that the circumstantial evidence in this case is also sufficient to prove this fact. As stated by the trial court in its memorandum opinion:

> "It is true that evidence does not establish beyond a reasonable doubt that Mr. Felchle's conduct caused the ultimate problem, but we do know that he engaged in conduct which would create this result, assuming the turkey contained salmonella before he began cooking it. There is no evidence to suggest any other source; the evidence is to the contrary. Common sense dictates the conclusion that it is more likely than not that Mr. Felchle's turkey did contain salmonella and that his efforts to prepare it were inadequate to kill the bacteria."

After considering the entire evidence, we are not left with a definite and firm conviction that a mistake has been made. Accordingly, the judgment is affirmed.

SAND and PEDERSON, JJ., and PAULSON,* Surrogate Justice, and NORMAN J. BACKES, District Judge, concur.

BACKES, District Judge, sitting in place of VANDE WALLE, J., disqualified.

---

\* Justice WM. L. PAULSON served as a Surrogate Judge for this case pursuant to Section