Christine MORDEN, Plaintiff-Respondent-Cross-Appel-
lant-Petitioner,

Thomas MORDEN, Plaintiff-Respondent-Petitioner,

CITY OF MILWAUKEE, Wisconsin Health Organization
and Compcare, Plaintiffs,

v.

CONTINENTAL AG, Defendant-Appellant-Cross-
Respondent,†

MR. P'S IDEAL TIRES CORPORATION, Defendant.

Supreme Court

*No. 98–0073. Oral argument November 30, 1999.——Decided
June 16, 2000.*

2000 WI 51

(Also reported in 611 N.W.2d 659.)

†Motion for reconsideration denied September 14, 2000.

326

For the plaintiff-respondent-cross appellant-petitioner and the plaintiff-respondent-petitioner there were briefs by *Robert A. Slattery, Alan E. Gesler*, and *Slattery & Hausman, Ltd.*, Waukesha, and *M. Nichol Padway* and *Padway & Padway, Ltd.*, Milwaukee, and oral argument by *Robert A. Slattery*.

For the defendant-appellant-cross respondent there was a brief by *Frank J. Daily, Francis H. LoCoco, Daniel J. LaFave* and *Quarles & Brady, LLP.*, Milwaukee, and oral argument by *Frank J. Daily*.

¶ 1. DAVID T. PROSSER, J. Christine and Thomas Morden (the Mordens) seek review of an

unpublished, per curiam decision of the court of appeals[1] that reversed a judgment of nearly $7 million entered in their favor by the Circuit Court for Milwaukee County, Francis T. Wasielewski, Judge. The circuit court ordered the judgment after a jury found Continental AG (Continental) negligent in the design or manufacture of two mud and snow tires mounted on the rear of the Mordens' vehicle.

¶ 2. This action arose from an accident in which Christine Morden suffered spinal cord injuries that rendered her a quadriplegic. In March 1991 Christine was traveling with her family to a Florida vacation in a Volkswagen (VW) Vanagon. She and her husband, Thomas, had shared the driving responsibilities during the course of the 23-hour drive from Milwaukee. Shortly before entering Florida, Christine took over at the wheel. When the Vanagon crossed an overpass, the Mordens felt a dip in the road and heard a pop. They assumed that their tires had blown out. Christine Morden lost control of the Vanagon. The Vanagon rolled over onto the grass median, landing on its left side. The roof of the vehicle crushed, and Christine Morden was not able to move.

¶ 3. The Mordens pursued both negligence and strict liability claims against Continental for the testing, design, and manufacture of the rear tires. The Mordens also sought recovery from VW, the manufacturer of the Vanagon, Ernie von Schledorn Imports, Inc. (EvS), the dealer that serviced the Vanagon, and Mr. P's Ideal Tire Corp. (Mr. P's), the retailer that sold the tires to the Mordens. Less than two weeks before the jury trial began, the Mordens reached an agreement with VW, under which the Mordens received a

---

[1] *Morden v. Continental AG*, No. 98–0073, unpublished slip op. (Wis. Ct. App. Apr. 13, 1999).

settlement of $500,000 in exchange for a covenant not to sue VW.

¶ 4. After a four-week trial, the jury unanimously found Continental negligent in the design or manufacture of the tires. It also determined that Continental was strictly liable for producing tires that were unreasonably dangerous. The circuit court, however, found the strict liability verdict defective because the same 10 jurors did not agree on answers to the questions relating to strict liability and damages. The jury also concluded that Christine Morden was negligent in the operation of the vehicle and that her negligence was a cause of the accident. Although the jury decided that Thomas Morden was negligent in the maintenance or selection of the tires, it answered that Thomas Morden's negligence was not a cause of the accident. The jury determined that Mr. P's and EvS were not negligent. The jury did not hear evidence about the covenant-not-to-sue agreement with VW, and therefore the court submitted no question about VW's negligence to the jury. The jury awarded $10,467,408 in damages to Christine Morden and $1,237,830 to Thomas Morden. It also apportioned 50 percent of the causal negligence to Continental and the other 50 percent to Christine Morden.

¶ 5. The circuit court approved the jury's verdict, with the exception of the strict liability determination, and entered a judgment on the Mordens' negligence claim. Taking into account the 50 percent negligence allocated to Christine and adding additional costs and interest, the circuit court ordered that Continental pay $6,206,699.91 to Christine Morden and $636,328.04 to Thomas Morden.

¶ 6. Continental appealed. The court of appeals reversed, holding that the evidence presented at the

trial was not sufficient to maintain the jury's finding that Continental was negligent. The court concluded that the Mordens had not proved that Continental breached a duty of care to them. The court reasoned that the Mordens failed to present evidence that Continental knew or should have known the design or manufacture of the tires was unsafe.

¶ 7. We frame four issues in this case. First, the Mordens ask this court to address numerous questions underlying the broad issue of whether the evidence offered at trial was sufficient to sustain the jury's finding that Continental was negligent in the design or manufacture of the tires. Second, the Mordens would like us to determine whether the jury returned a defective verdict for the strict liability claim. The Mordens present this second issue as an alternative to the first and ask us to consider it only if we affirm the court of appeals on the negligence claim. Third, the Mordens propose that this court revise the rules of appellate procedure to prevent the court of appeals from filing per curiam, unpublished decisions in complex cases that reverse judgments entered after a jury verdict. Fourth, in its cross-response, Continental maintains that the circuit court erred when it did not advise the jury about the covenant not to sue negotiated between VW and the Mordens. Continental argues that the exclusion of this evidence prevented it from receiving a fair trial. Consequently, Continental asks that we grant its request for a new trial if we reverse the decision of the court of appeals.

¶ 8. We conclude that the evidence presented at trial was sufficient to sustain the jury's finding that Continental was negligent. Under a reasonable view of this record, we find credible evidence to support the determination of the jury. Accordingly, we reverse the

335

court of appeals. Because we decide this case based on this first issue, we do not reach the Mordens' second, alternative issue relating to the validity of the strict liability verdict. Similarly, we do not address the third issue pertaining to the scope of per curiam opinions because our decision today reverses the decision of the court of appeals. For the fourth issue, we hold that the circuit court appropriately exercised its discretion when it declined to admit the evidence of the covenant not to sue. We also find a new trial is not warranted because Continental has not shown that the real controversy at issue was not tried or that the trial resulted in a miscarriage of justice.

## FACTS

¶ 9. The record in this case is extensive and reflects the protracted and acrimonious nature of the litigation. Although the underlying facts are not in dispute, the parties challenge the inferences and conclusions drawn from those facts.

¶ 10. On March 21, 1991, Christine and Thomas Morden left Milwaukee in their 1985, four-cylinder, VW Vanagon with two of their children, Melissa and Matthew, for a spring vacation in Florida. They had made this trip about 15 times before in the years between 1977 and 1990, usually timing the vacation so that it would coincide with the Easter holiday. The Mordens hoped to spend one week to ten days in Bonita Springs, a Gulf-side location where their parents have cottages.

¶ 11. The Mordens began the trip at about 6:00 p.m. on the Thursday preceding Easter. Christine worked as a daycare provider, and the Mordens waited to depart until the client parents had picked up their children at the end of the day. Thomas returned from

his job at 8:00 a.m. that morning after completing a 24-hour shift as a firefighter for the Milwaukee Fire Department. Neither he nor Christine slept during the day of the departure, but Thomas testified that he was not tired and that he typically was able to sleep at work during an 11-hour period between fire calls. Each Morden expected to sleep during those portions of the trip when the other drove.

¶ 12. The Mordens planned to drive straight through to their Florida destination, taking turns at the wheel in 200-mile shifts between tanks of gas. Thomas Morden estimated they would travel between 26 and 28 hours. They had driven straight through in this manner during their previous 15 road trips to Florida.

¶ 13. Thomas Morden loaded the Vanagon for the vacation. Having made the trip before, he testified that over time the family had been taking fewer things with them. In addition to four suitcases, Thomas Morden packed a 10-pound microwave oven, a cooler containing a 12-pack of soda, a few board games, and pillows and blankets. He also mounted a Lazer, a one-person 14-foot sailboat, to the roof of the Vanagon. The Lazer is a flat-decked, fiberglass craft, similar to a surfboard, that weighs about 135 pounds.[2] Thomas Morden also attached a Hobie Cat, a lightweight sailboat consisting of a canvas stretched across two catamaran pontoons, to a trailer at the rear of the Vanagon. VW had advertised a Vanagon/Hobie Cat package in the mid–1980s. One such promotion, apparently targeting VW retailers, featured a Hobie Cat perched on the roof of a Vanagon and promised that "these Vanagons will

---

[2] Thomas Morden testified that The VW Owner's Manual recommended securing no more than 200 pounds to the roof of the vehicle.

be sailing out of your showroom."[3] Although VW promotional materials were not shown to Thomas Morden during the trial, Thomas recalled seeing a Vanagon/Hobie Cat advertisement, and he believed that the Vanagon was designed for the purposes advertised, namely family trips and vacations.

¶ 14. During the drive, the Mordens traveled through Illinois, Indiana, Kentucky, Tennessee, and Georgia. They had followed this route on previous trips, and, depending on the date of the Easter holiday, the Mordens occasionally ran across inclement weather. For instance, the family once encountered nearly eight inches of snow one spring near Atlanta. Taking into account the potential conditions and the fact that the holiday fell early in the calendar that year, Thomas decided it was better to leave snow tires on the Vanagon.

¶ 15. When the Mordens reached the last stop in Georgia before the Florida border, Christine assumed the driving responsibilities from Thomas. They had been on the road for roughly 23 hours and were about 360 miles from their destination. During that time, the Mordens experienced no problems with the Vanagon or its tires. Thomas Morden did not notice any swaying of the trailered Hobie Cat. Thomas explained that he had

---

[3] The 1986 Fall/Winter issue of *Volkswagen Parts and Advice* featured on its cover a Vanagon parked on a beach alongside a small, one-person sailboat that resembles the Lazer Thomas Morden described and another sailboat akin to the Hobie Cat. The photo description stated that:

> [T]he cover picture tells the Vanagon story. . .a passenger van with versatility, reliability and durability that combine to make the Vanagon the single smartest purchase you can make to meet your personal transportation needs (Note: Cover photograph of the Vanagon GL is for promotional purposes only. Off-road use is not recommended.)

traveled so many times with the Hobie Cat in tow that he would check the trailer during stops, walking around to verify that it was tied down properly.[4] He conceded, however, that the Hobie Craft "waddled a bit" if a semi-trailer passed alongside the Vanagon.

¶ 16. Christine had been driving for about 30 minutes on Interstate 75 when the Mordens noticed heavy traffic as they approached Florida. Thomas Morden was not able to see the speedometer from his position in the passenger seat, but he estimated that the Vanagon was traveling anywhere from 55 to 65 miles per hour, moving with the flow of traffic. The posted speed limit was 65 miles per hour. Another driver traveling on the interstate, Scott Leonhard, testified that his cruise control was set at 72 miles per hour and that he and the Vanagon occasionally passed each other.

¶ 17. As Christine continued down Interstate 75, she drove onto an overpass. Thomas and Christine Morden felt a "dip" in the asphalt when the Vanagon crossed the overpass and returned to the highway. After passing the dip, the Mordens heard a "pop" and assumed that the tires had blown. Witness Leonhard observed the back of the van lift up off the ground. To the Mordens, the Vanagon felt as if it were fishtailing on ice, light in the rear and lacking stability. Christine slowed down to 35 or 40 miles per hour and made slight steering maneuvers, keeping her feet off the brake and gas pedals. She continued in this manner for about a distance of three blocks, when the Vanagon lost control.[5] At that point, the vehicle rolled to its right side,

---

[4] The Mordens had towed the trailer for approximately seven years without any mishaps.

[5] Although witness Leonhard conceded that he could not see the Vanagon's tires at the time of the accident, he observed

swerved left, slid, and then bounced and rolled to the grass median, coming to rest on the left, the driver's side.

¶ 18. Thomas Morden noticed that Christine was down low, lying on her left side behind the steering wheel. At first, she told Thomas that she was okay, but she was not able to move or to lift herself from the vehicle. Christine Morden was wearing a three-point restraint seat belt. The belt allowed slack to travel down through the restraint to her lap. Consequently, when the accident occurred, Christine's head hit the roof of the vehicle. The roof of the Vanagon also caved in over her head. After paramedics removed the driver's seat and extricated Christine, she was transported 75 miles by helicopter to a hospital in Jacksonville, Florida. The Morden family learned that Christine suffered a spinal cord injury that resulted in paralysis. Christine Morden now is a quadriplegic.

¶ 19. After the crash, Florida State Trooper Harry Fouraker, the accident investigation officer, inspected the area around the overpass and noticed nothing on the road surface that could have caused the accident. Upon looking at the Vanagon, Trooper Fouraker saw that its rear tires were blown out and punctured and that the tires' sidewalls were ripped. The Mordens' accident reconstruction expert, Morrie Shaw, later testified that both wheels on the Vanagon had ruptured simultaneously and suggested that a

nothing to suggest that the vehicle lost control because of the blowout. Rather, Leonhard attributed the loss of control to an abrupt lane change and the swaying of the trailer. Leonhard observed the Hobie Cat trailer swaying severely before the accident. A second witness reported to police that he saw no swaying, weaving, or signs that the driver, Christine Morden, suffered from fatigue.

340

bump or dip in the overpass triggered the rupture. Similarly, Continental quality assurance engineer Victor Bleumel, who inspected the tires, hypothesized that the tires struck something that precipitated the blowout.[6]

¶ 20. Trooper Fouraker found the damaged tires unique and suggested to Thomas Morden that they deserved further investigation. The officer made no similar recommendation about the Hobie Cat trailer, the Lazer sailboat, or the Vanagon itself. Fouraker did characterize the loading of the vehicle as more consistent with a "mini-move" than a family vacation, but reconstruction expert Shaw calculated that the actual loaded weight of the Vanagon was less than the load capacity of the rear tires by a total of 1,178 pounds. Similarly, Mr. P's tire consultant, Donald Avila, testified that loading had nothing whatsoever to do with the failure of the tires.

¶ 21. The rear tires that blew out on Interstate 75 were Continental mud and snow tires that Thomas Morden purchased from Mr. P's in November 1989, about one and one-half years before the accident. Previously, Michelin tires were mounted on the rear wheels of the Mordens' vehicle. Morden read the Vanagon's Owner's Manual, which instructed owners to purchase tires with the same specifications when making replacements. In fact, Morden had worked as a VW mechanic at two different dealerships during the early 1970s. Thomas Morden was not able to locate the same type of Michelin replacement tires. When Morden acquired the Continental tires, he knew that they were bigger than what the Owner's Manual recommended, but he testified that he was "told they would work."

---

[6] Victor Bleumel did not testify at the trial. His deposition was read into the record by the Mordens.

341

Thomas Morden also explained that he thought he "was getting a bigger, stronger tire that would work on the back of the car."

¶ 22. As far as Morden knew, the Continental tires were a comparable size to the Michelins and thus would suit the Vanagon. Tire consultant Avila found the dimensions of the tires and their loading capacity appropriate for the Vanagon. Similarly, the owner of Mr. P's and the employee who sold the tires to Thomas Morden stated that the Continental tires were acceptable. Reconstruction expert Shaw and the Mordens' tire expert, John Taylor, disagreed, however, and stated that Morden had bought the wrong tires for the vehicle.

¶ 23. When Morden purchased the tires, the invoice stated that the tires came from "old stock." Both tires had been manufactured at the same plant in 1979 and were in Mr. P's stock for about 10 years. Taylor admitted that he had no information about where or how the tires were stored during that 10-year interval, whether they were stored properly, or whether they had been used before. Taylor suspected, however, that the tires had only 12,000 to 20,000 miles on them. Avila testified that the age and storage of the tires did not affect their failure.

¶ 24. Thomas Morden did not know that the Continental tires carried a maximum tire inflation pressure rating of 36 pounds per square inch (psi). Visually, the tires had looked fine to Morden from the day he purchased them until the accident, but he could not recall ever checking the pressure personally to determine whether the tires were overinflated or underinflated. An employee of Tech Lube, a garage that serviced the Vanagon, stated that the vehicle's tires were inflated to 45 psi, or 25 percent beyond the

maximum rating of 36 psi, just three months before the accident. The Mordens' own tire expert, Taylor, observed that the vehicle had been driven with overinflated tires for some time. Taylor agreed that overinflation can contribute significantly to separation between the steel belts in radial tires. On the other hand, tire consultant Avila explained that overinflation did not cause these tires to rupture.

¶ 25. Steel-belted radial tires contain two belts, a top belt and a bottom belt, that adhere together. The area between the belts is vulnerable: When driven, the tires experience high centrifugal forces that tend to pull the two belts apart as the tires whirl. Progressive belt separations can lead to the sudden failure of a tire. If the belts pull apart, the tire can split open and flatten.

¶ 26. To perform properly, steel-belted radial tires rely on adhesion between the belts to ensure that they do not separate. As tires age, they normally undergo some loss of adhesion. A nylon device, the "cap ply," functions as an additional adhesive to prevent belt separation. The cap ply wraps over the steel belts, runs around the circumference of the tire like an athletic bandage, and holds the belts down together. The cap ply also prevents the tire from expanding in size as the tire makes its revolutions. According to tire expert Taylor, manufacturers usually do not install cap plies in normal passenger tires, such as mud and snow tires, unless the tires are likely to experience a problem with belt separation.

¶ 27. The weakest point of a cap ply is the splice, the area at which one end of the cap ply joins or overlaps the other end. Cap plies can join in one of two ways: (1) A "single wrap" design creates one layer of nylon cording with an area of overlap at the point of

unison; or (2) a "double wrap" design winds the nylon cording around the belts twice so that the splice overlap covers the entire area of the belts. Although a 1974 patent for steel-belted radial tires acknowledged that single-wrapped cap splices were "known in the art," Taylor testified that double-wrapped cap splices were already in use in the 1960s and 1970s. Taylor explained that the double wrap makes the splice area less critical by minimizing the possibility that the cap ply will pull apart at the splice. Double-wrap splices, Taylor suggested, eliminate the weaknesses usually associated with a single splice.

¶ 28. The Continental tires that ruptured on the Mordens' vehicle featured a single-wrap cap splice. The record does not reveal whether Continental tested the strength of the single-wrap cap splice on the type of mud and snow tires mounted on the Vanagon. Taylor testified that both tires failed by splitting "right at this cap splice." Continental's quality control engineer, Victor Bleumel, conducted a physical and x-ray examination of the tires. Bleumel found a row of "bubbles" running along the inside of the tire from roughly a 12 o'clock to a four o'clock position. The extent of the bubbles coincided with the length of the belt separation. Taylor explained that the length of these bubbles, which were not visible from outside the tire, suggested that the belt separations had been present in the tire "for a good portion of its life" and had been growing larger as the tire was used.

## PROCEDURAL HISTORY

¶ 29. The Mordens filed a suit for damages against Continental, VW, Mr. P's, and EvS. On August 1, 1997, 11 days before the trial commenced, the Mordens negotiated a covenant not to sue with VW.

They agreed not to sue VW in exchange for a $500,000 settlement. Over a series of motions in limine, the circuit court ruled that evidence of this settlement was not admissible. The court reasoned that the evidence would be admissible only if it would show that the alignment or testimony of a party in the case had changed as a result of the agreement.

¶ 30. As the trial reached the end of its fourth week, the circuit court submitted a Special Verdict of 15 questions to the jury.[7] The Special Verdict asked the

---

[7] The Special Verdict stated:

1. Was the defendant, Continental Tire, negligent in the design or manufacture of the 215/70 mud and snow tires which were on the rear of the Vanagon at the time of the accident?

ANSWER: Yes

2. If you answered Question No. 1 "yes", then answer this question: Was such negligence of Continental Tire a cause of the accident?

ANSWER: Yes

3. Were the 215/70 mud and snow tires when they left the possession of Continental Tire in such defective condition as to be unreasonably dangerous to a prospective user?

ANSWER: Yes

4. If you answered Question No. 3 "yes", then answer this question: Was such defective condition a cause of the accident?

ANSWER: Yes

5. Was the defendant, Mr. P's Ideal Tires, negligent with respect to the selection and [/or] sale of the 215/70 mud and snow tires?

ANSWER: No

6. If you answered Question No. 5 "yes", then answer this question: Was such negligence of Mr. P's Ideal Tires a cause of the accident?

ANSWER: ———

7. Prior to the accident, was the defendant Ernie Von Schledorn negligent with respect to the maintenance of the tires on the Vanagon?

jury to determine the negligence of Continental, Mr. P's, and EvS, as well as Christine and Thomas Morden.

ANSWER: No

8. If you answered Question 7 "yes", then answer this question: Was such negligence of Ernie Von Schledorn a cause of the accident?

ANSWER: ———

9. Was the plaintiff, Christine Morden, negligent with respect to her operation of the Vanagon at and immediately prior to the occurrence of the accident?

ANSWER: Yes

10. If you answered Question No. 9 "yes", then answer this question: Was such negligence of Christine Morden a cause of the accident?

ANSWER: Yes

11. Prior to the accident, was plaintiff Thomas Morden negligent with respect to the selection and [/or] maintenance of the tires on the Vanagon?

ANSWER: Yes

12. If you answered Question 11 "yes", then answer this question: Was such negligence of Thomas Morden a cause of the accident?

ANSWER: No

13. Assuming that the total negligence which caused the accident to be 100%, what percentage of that negligence do you attribute to:

A. Continental Tire

(If you did not answer either Question No. 2 or No. 4, or answer both "No", then insert "0".)

ANSWER: 50%

B. Mr. P's Ideal Tires

(If you did not answer Question No. 6 or answered it "No", then insert "0".)

ANSWER: 0%

C. Ernie Von Schledorn

(IF you did not answer Question No. 8 or answered it "No", then insert "0".)

ANSWER 0%

Because VW was dismissed without objection, the Special Verdict questions did not address whether VW was

D. Christine Morden

(If you did not answer Question No. 10 or answered it "No", then insert "0".)

ANSWER: 50%

E. Thomas Morden

(If you did not answer Question No. 12 or answered it "No", then insert "0".)

ANSWER: 0%

TOTAL: 100%

14. Regardless of how you have answered any of the preceding questions, please answer the following: What sum of money, if any, will fairly and reasonably compensate Christine Morden for any damages sustained by her as a natural and probable consequence of the March 22, 1991 accident with respect to:

A. Past medical, hospital and care expenses:

ANSWER: $416,843.00

(answered by the Court)

B. Future medical, hospital and care expenses:

ANSWER: $2,850,000

C. Past loss of earnings from self-employment:

ANSWER: $75,000

D. Future loss of earning capacity:

ANSWER: $125,565

E. Past and future pain, suffering and disability:

ANSWER: $7,000,000

15. Regardless of how you have answered any of the preceding questions, please answer the following: What sum of money, if any, will fairly and reasonably compensate Thomas Morden for damages sustained by him as a natural and probable consequence of any injuries of his wife in the March 22, 1991 accident with respect to:

A. Past and future nursing care and attendant services provided to his wife:

ANSWER: $487,830

347

negligent. The Special Verdict also required the jury to apportion the percentage of causal negligence among Continental, Mr. P's, EvS, Christine Morden, and Thomas Morden.

¶ 31. After five days of deliberation, on September 12, 1997, the jury unanimously found Continental negligent in the design or manufacture of the tires and concluded that this negligence was a cause of the accident. For the strict liability claim, 10 jurors found that the tires were in an unreasonably dangerous, defective condition when the tires left Continental's possession. Two jurors dissented from this answer. Ten jurors also determined that this defective condition was a cause of the accident. Again two jurors dissented. On the damages question, a different juror disagreed with the jury's answer. Both Mr. P's and EvS were found not negligent. The jury concluded that Christine Morden was negligent with respect to her operation of the Vanagon, and it found that her negligence was a cause of the accident. Although the jury also found Thomas Morden negligent in the selection or maintenance of the Continental tires, it did not find his negligence a cause of the accident. The jury apportioned 50 percent of the negligence to Continental and 50 percent to Christine Morden. The jury awarded $10,467,408 in damages to Christine Morden and $1,237,830 to Thomas Morden.

¶ 32. The circuit court considered motions after verdict. Continental asked the court to overturn the jury verdict on the negligence claim and to find the strict liability verdict defective. The court agreed with Continental on the strict liability claim because the same 10 jurors had not agreed about all questions. The

B. Loss of consortium of Christine Morden:

ANSWER: $750,000

348

court reasoned the strict liability verdict was defective under *Giese v. Montgomery Ward*, 111 Wis. 2d 392, 401, 331 N.W.2d 585 (1983), which requires that five-sixths of a jury must agree on all questions to support judgment on a particular claim.

¶ 33. The court declined, however, to overturn the negligence verdict. Instead, the court adopted the jury's verdict as its own. The court agreed that it was "reasonably foreseeable" to Continental that the design or manufacture of the tires posed an "unreasonable risk of injury." The court observed that John Taylor had testified about Continental's failure to install the double-wrap cap splice. Furthermore, other manufacturers commonly use double-wraps in the tire industry. The court also responded to Continental's argument that the jury overlooked evidence that Christine Morden was negligent in the manner in which she drove the Vanagon by explaining that product misuse speaks to contributory negligence, and plaintiffs are not required to prove that they were free from negligence. Evidence of misuse was presented at trial, and the jury allocated 50 percent of the negligence to Christine Morden.

¶ 34. Finally, the court addressed Continental's request for a new trial. Continental argued that the decision not to admit evidence of the VW agreement was prejudicial to its case. The court stood on the rulings it had made in earlier proceedings and declined the motion for a new trial.

¶ 35. The circuit court entered an order for judgment on November 24, 1997. The judgment provided that Continental must pay $6,206,699.91 to Christine Morden and $636,328.04 to Thomas Morden. These sums represented the amount of the total verdict of the jury, reduced by 50 percent, plus taxable costs and

interest accrued on the award in the interval between the verdict and the judgment.

¶ 36. Continental appealed. The court of appeals reversed the circuit court, holding that the evidence presented at the trial was not sufficient to maintain the jury's finding that Continental was negligent in the design and manufacture of the tires. *Morden v. Continental AG*, No. 98–0073, unpublished slip op. at 2, 7. The court accepted Continental's argument that it had not breached its duty of ordinary care. In so holding, the court asserted that the Mordens failed to present evidence that Continental knew or should have known that the tires were unsafe. The existence of safer, alternative manufacturing methods, the court said, is not sufficient to establish that a defendant created a product with a lack of ordinary care. *Id.* at 4, 6 (citing *Locicero v. Interpace Corp.*, 83 Wis. 2d 876, 890, 266 N.W.2d 423 (1978)). Rather, the plaintiff must show that the defendant knew or should have known that the design or manufacture of the failed tires was unsafe. Although the court acknowledged that the Mordens' tire expert testified that the tires ruptured because a separation occurred between the belts in the radial tires, it concluded that the expert had not pinpointed whether that defect arose during the manufacturing process or in the course of the vehicle's operation.

¶ 37. After the court of appeals issued its decision, the Mordens filed a motion for reconsideration, asking the court to reconsider its decision on the negligence issue and remand the case for a retrial on the strict liability claim. *Morden v. Continental AG*, No. 98–0073, unpublished slip op. (Wis. Ct. App. May 27, 1999). The court of appeals denied the request and held that the Mordens had waived the right to a retrial for

two reasons. First, the Mordens failed to ask the circuit court to reinstruct the jury on the strict liability questions and to seek further deliberations. *Id.* at 3. Second, the Mordens did not raise the defective verdict as a basis for seeking a new trial on the strict liability claim during the motions after verdict.

## SUFFICIENCY OF EVIDENCE TO SUPPORT JURY VERDICT

¶ 38. We begin our analysis of the first issue, namely whether there was sufficient evidence to sustain the jury's verdict in the negligence claim, by addressing the standard of review. Our review of a jury's verdict is narrow. Appellate courts in Wisconsin will sustain a jury verdict if there is any credible evidence to support it. *Meurer v. ITT Gen. Controls*, 90 Wis. 2d 438, 450, 280 N.W.2d 156 (1979); *Giese*, 111 Wis. 2d at 408. Moreover, if there is any credible evidence, under any reasonable view, that leads to an inference supporting the jury's finding, we will not overturn that finding. *Ferraro v. Koelsch*, 119 Wis. 2d 407, 410–11, 350 N.W.2d 735 (Ct. App. 1984), *aff'd*, 124 Wis. 2d 154, 368 N.W.2d 666 (1985); Wis. Stat. § 805.14(1).[8]

---

[8] Wisconsin Stat. § 805.14(1) provides:

(1) TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

All references to the Wisconsin Statutes are to the 1989–90 volumes unless indicated otherwise.

¶ 39. In applying this narrow standard of review, this court considers the evidence in a light most favorable to the jury's determination. *Meurer*, 90 Wis. 2d at 450; *Stunkel v. Price Elec. Coop.*, 229 Wis. 2d 664, 668, 599 N.W.2d 919 (Ct. App. 1999). We do so because it is the role of the jury, not an appellate court, to balance the credibility of witnesses and the weight given to the testimony of those witnesses. *Meurer*, 90 Wis. 2d at 450. To that end, appellate courts search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not. *Wheeler v. General Tire & Rubber Co.*, 142 Wis. 2d 798, 809, 419 N.W.2d 331 (Ct. App. 1987) (citing *Gonzales v. City of Franklin*, 137 Wis. 2d 109, 134, 403 N.W.2d 747 (1987)). If we find that there is "any credible evidence in the record on which the jury could have based its decision," we will affirm that verdict. *Lundin v. Shimanski*, 124 Wis. 2d 175, 184, 368 N.W.2d 676 (1985). Similarly, if the evidence gives rise to more than one reasonable inference, we accept the particular inference reached by the jury. *Meurer*, 90 Wis. 2d at 450; *Ferraro*, 119 Wis. 2d at 410–11. This court will uphold the jury verdict "even though [the evidence] be contradicted and the contradictory evidence be stronger and more convincing." *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 390, 541 N.W.2d 753 (1995).

¶ 40. The standard of review in this case is even more stringent because the circuit court approved the jury's verdict. We afford special deference to a jury determination in those situations in which the trial court approves the finding of a jury. *Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 331, 552 N.W.2d 869 (1996). In

such cases, this court will not overturn the jury's verdict unless "there is such a complete failure of proof that the verdict must be based on speculation." *Coryell v. Conn*, 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979).

¶ 41. Having addressed the standard of review, we now turn to the heart of the negligence issue by examining whether there is credible evidence in the record to support the jury's determination. Given the narrow standard of review in this case, we undertake our analysis by viewing the evidence in a light most favorable to the jury verdict and by accepting the particular inferences drawn by the jury.

¶ 42. Wisconsin case law allows plaintiffs to seek recovery from a manufacturer for the defective design of a product under a strict liability theory and/or a negligence theory. *Sharp v. Case Corp.*, 227 Wis. 2d 1, 16, 595 N.W.2d 382 (1999) (citing *Greiten v. LaDow*, 70 Wis. 2d 589, 235 N.W.2d 677 (1975) (Heffernan, J., concurring)). The coexistence of the two theories has sparked confusion and criticism because both rely on an underlying product defect. *See id.* at 19; *see also* Erik J. Pless, *Wisconsin's Comparative Negligence Statute: Applying It To Liability Cases Brought Under A Strict Liability Theory*, Wisconsin Lawyer (August, 1998). Nonetheless, negligence and strict liability continue to offer separate avenues to recovery: This court recently declined to overrule *Greiten*, the case in which Justice Heffernan's controlling concurrence set forth the key distinctions that separate the two types of claims. *See Sharp*, 227 Wis. 2d at 16–17.

¶ 43. The proof required in a strict liability claim differs from the quantum of proof in a negligence claim. Under a strict liability theory, the plaintiff must prove

the five elements set forth in *Dippel v. Sciano*, 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967).[9] In *Greiten*, this court summarized these elements to the effect that, "It is sufficient for the plaintiff to show that the product reached him in a dangerously defective condition." *Greiten*, 70 Wis. 2d at 601. Claims brought under a strict liability theory thus focus on the condition of the product. *Tanner v. Shoupe*, 228 Wis. 2d 357, 365 n.3, 596 N.W.2d 805 (Ct. App. 1999) (citing *Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 734–35, 218 N.W.2d 279 (1974)). Strict liability requires a showing that the condition of the product was unreasonably dangerous or otherwise posed an extraordinary form of danger. *Sharp*, 227 Wis. 2d at 19.

¶ 44. In a negligence action, by contrast, it is not necessary to show that the condition of the product reached the level of unreasonable dangerousness. *Id.* at 7, 16–17; *Greiten*, 70 Wis. 2d at 603. In that respect, the plaintiff's required proof appears less onerous at

---

[9] In *Dippel v. Sciano*, 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967), this court set forth the five elements of a strict liability claim:

[T]he plaintiff must prove

(1) that the product was in defective condition when it left the possession or control of the seller,

(2) that it was unreasonably dangerous to the user or consumer,

(3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages,

(4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and

(5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

first glance. On the other hand, under a negligence theory, a plaintiff will not prevail by showing only that a product was defective. The principles of negligence law hinge on a defendant's conduct, and therefore the plaintiff must show that the defendant was at fault. *D.L. v. Huebner*, 110 Wis. 2d 581, 610, 329 N.W.2d 890 (1983); *see also Greiten*, 70 Wis. 2d at 603.

¶ 45. A negligence action requires the proof of four elements: "(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Rockweit v. Senecal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995).

¶ 46. Working under this standard of proof, the first question we ask is whether the Mordens satisfied the first element by showing that Continental owed a duty of care to them. *See id.* at 419. Wisconsin has long recognized that each individual owes a duty of care to others:

> The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act.

*Id.* at 419–20 (citing *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (1928) (Andrews, J., dissenting)). The duty of care of a defendant is established when we can state that it was foreseeable that the defendant's act or omission could harm or injure another person. *Antwaun A. v. Heritage Mut. Ins. Co.*, 228 Wis. 2d 44, 55, 996 N.W.2d 456 (1999). The first element, duty of care, therefore pivots on foreseeability. *Id.* at 55–56.

¶ 47. When assessing foreseeability, our courts do not require the plaintiff to prove that a particular injury is foreseeable; rather, it is sufficient to show that "some injury could reasonably have been foreseen." *Fischer v. Cleveland Punch & Shear Works Co.*, 91 Wis. 2d 85, 97, 280 N.W.2d 280 (1979). Moreover, the test of foreseeability expects manufacturers to "anticipate the environment which is normal for the use of his product." *Tanner*, 228 Wis. 2d at 367 (quoting *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis. 2d 882, 896, 275 N.W.2d 915 (1979)). Consequently, the duty of care requires manufacturers to foresee all reasonable uses and misuses and the consequent foreseeable dangers, *id.* at 368 (citing *Schuh*, 63 Wis. 2d at 742–43), and to act accordingly.

¶ 48. To establish that Continental owed a duty of care to the Mordens, we therefore must determine whether there was any credible evidence or inference therefrom to support the finding that Continental knew or, in the exercise of ordinary care, should have known, that the tires posed a foreseeable risk of injury. This analysis requires us also to consider whether Continental could have foreseen that dangers would result if the Mordens misused the tires.

¶ 49. The court of appeals in this case held that the Mordens failed to prove that Continental owed a duty of care to the Mordens because they did not present evidence that Continental knew or should have known that the tires were unsafe. We respectfully disagree. Credible evidence presented at trial suggests that the Continental tires evinced a belt separation problem that made a rupture possible. Tire expert Taylor testified that manufacturers do not install cap plies in tires unless they are likely to experience belt separation:

"[T]he existence of the cap ply indicates that they were using that to overcome the problems of keeping the steel belts together." Taylor explained that, "Normally you don't see a cap ply in a normal passenger tire except if it's needed in order to keep the separation resistance of the tire at acceptable levels." The cap ply functions as "a Band-Aid to fix a problem" and keeps the belts together to reduce separations. Based on this testimony, the jury could have concluded that the presence of the cap ply in the tire design indicates that Continental had actual knowledge of a belt separation problem, and that Continental could have foreseen that a belt separation was possible. The rupture of the tires on the Mordens' vehicle was not a "most unusual and highly coincidental circumstance[ ] that had to be present for somebody to be injured." *Greiten*, 70 Wis. 2d at 598; *see also Fischer*, 91 Wis. 2d at 95. It is not unusual to foresee that if tires are inclined to rupture, they are more likely to rupture and cause injury when a vehicle is traveling at high speeds.

¶ 50. The jury in this case also could have concluded reasonably that Continental foresaw misuse of the tires. Continental's 1988 Tire Guide alerts owners to refer to the tire information placard "for the correct tire size and inflation pressure." The Guide also notes that "replacement tires must have adequate load carrying capacity," and it outlines the proper load/inflation ratios for popular American automobile tire sizes. Continental's inclusion of this information relating to load and tire inflation, designed "to assure satisfactory tire performance," reveals that the manufacturer foresaw at least some types of consumer misuse.

■■■

¶ 51. From the testimony and evidence presented at trial, the jury could have inferred that

Continental knew or should have known that the tires foreseeably were prone to belt separations and that misuse of the tires would pose a risk of foreseeable injury. Under the deferential standard of this review, we find that it was reasonable for the jury to infer that Continental owed a duty of care to the Mordens.

¶ 52. Having established that Continental owed a duty of care, we now apply our standard of review to the second element of the negligence analysis by considering whether the jury reasonably could have inferred that Continental breached its duty of care.

¶ 53. In determining whether a defendant breached the duty of care, we hold the defendant to the standard of ordinary care:

> Ordinary care is the degree of care which the great mass of mankind ordinarily exercises under the same or similar circumstances. A person fails to exercise ordinary care when, without intending to do any harm, he does an act or omits a precaution under circumstances in which a person of ordinary intelligence and prudence ought reasonably to foresee that such act or omission will subject the person of another to an unreasonable risk of injury.

*State v. Bodoh*, 226 Wis. 2d 718, 732, 595 N.W.2d 330 (1999) (quoting Wis JI—Criminal 1260); *see also* Wis JI—Civil 1005.

¶ 54. Product manufacturers are held to this same standard of ordinary care. *Smith v. Atco. Co.*, 6 Wis. 2d 371, 383, 94 N.W.2d 697 (1959). In gauging the liability of a manufacturer, we ask whether a "reasonably prudent person in the shoes of the defendant manufacturer" would exercise the same degree of care.

*Id.* In a negligence claim against a manufacturer, "the plaintiff is simply required to prove that the defendant failed to exercise ordinary care and the act or omission complained of was the cause, in the legal sense, of the plaintiff's injury." *Greiten*, 70 Wis. 2d at 601; *see also Fischer*, 91 Wis. 2d at 92.

¶ 55. To date, our courts have held that a showing by a plaintiff that better methods of manufacture exist does not conclusively prove that a defendant created the product with a lack of ordinary care. *Morden v. Continental AG*, No. 98–0073 unpublished slip op. at 4; *Greiten*, 70 Wis. 2d at 602; *Locicero*, 83 Wis. 2d at 890. Under this approach, negligence usually attaches only when the plaintiff can prove that the defendant selected the more dangerous route of manufacture knowing that it was unsafe. *Locicero*, 83 Wis. 2d at 890.

¶ 56. Manufacturers nonetheless are held to the "reasonable person" standard of customary methods of manufacture in a similar industry. *Huebner*, 110 Wis. 2d at 616–17. Although nonconformance with industry custom is not conclusive proof of a failure to exercise ordinary care, it does provide evidence to the jury about whether the defendant reasonably could have done something to prevent the harm. *Id.* at 619; *see also Fischer*, 91 Wis. 2d at 97. Evidence of "the custom in the industry (what the industry was doing) and the state of the art (what the industry feasibly could have done) at the time" of the design or manufacture is relevant to the jury's determination of negligence. *Huebner*, 110 Wis. 2d at 616–17. Given evidence of industry practices, the jury can make the determination whether the manufacturer reasonably and economically could have chosen an alternative course of conduct. *Id.* at 619.

¶ 57. The jury in this case reasonably could have concluded that Continental's failure to take the available precaution of using a double-wrap cap splice constituted a lack of ordinary care, even if the record is silent about whether Continental conducted tests on the single-wrap cap splice. Existing technology addressed the danger of belt separation in the manufacture of radial tires. A 1974 steel-belted radial tire patent states that: "It is known that many types of tires, especially radial ply carcass tires. . .often fail at high speeds because separations occur in the shoulder zones of the tires where the edges of the belt plies are located." Taylor testified that the single-wrap cap splice was not effective in preventing the underlying adhesion problem, adding that the double-wrap technology designed to eliminate belt separation had been known and generally used in the tire industry since the 1960s and 1970s. The patent acknowledges that single-wrap cap splices are "known in the art" but adds that such a design "does not, however, disclose a structure which overcomes either the problem of tire distortion and ply separation at high speeds." The patent alone may not establish the standard in the tire industry. Taken together, however, the patent and Taylor's testimony illustrate industry knowledge and address what feasibly could have been done at the time of the tire's manufacture.

¶ 58. From this evidence, the jury could have reasoned that Continental should have chosen an alternative design to prevent the harm caused by belt separation. Consequently, credible evidence exists that could have led the jury to infer that Continental breached its duty of ordinary care. The inference is not the only one that a jury could reach from the evidence;

nonetheless, an appellate court reviewing a jury verdict must accept the particular inference drawn by the jury. *Meurer*, 90 Wis. 2d at 450; *Ferraro*, 119 Wis. 2d at 410–11.

¶ 59. We next apply our standard of review to the third element of the negligence analysis by determining whether there is credible evidence to support the jury's conclusion that there was a causal connection between Continental's manufacture of the tires and Christine Morden's injuries.

¶ 60. The element of causation turns on "whether the defendant's negligence was a substantial factor in producing the injury." *Nieuwendorp v. American Family Ins. Co.*, 191 Wis. 2d 462, 475, 529 N.W.2d 594 (1995). Our inquiry into causation focuses on the nexus between the design or manufacture of the tires and Christine Morden's injuries. To discern whether such a nexus exists, we must determine whether the defendant's actions were a "cause-in-fact" of the injuries. If they were, we explore whether the conduct of the defendant was a "proximate cause" of the harm sustained by the plaintiff. Proximate cause involves public policy considerations for the court that may preclude the imposition of liability. *See Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 264, 580 N.W.2d 233 (1998). After the determination of the cause-in-fact of an injury, a court still may deny recovery after addressing policy considerations, or legal cause. *Coffey v. Milwaukee*, 74 Wis. 2d 526, 541, 247 N.W.2d 132 (1976). This case, however, does not turn on proximate cause. Because legal cause is not at issue in this case, we focus our attention on the question of cause-in-fact.

¶ 61. In this case, the jury found that the design or manufacture of the tires was a cause-in-fact of the

accident. In addition, 10 members of the jury concluded that the tires left the possession of Continental in such defective condition as to be unreasonably dangerous to a prospective user and that the defective condition was a cause of the accident. Although the circuit court discarded the strict liability verdict in this case, the jury's answers to Questions 3 and 4 of the Special Verdict prevent Continental from now relying upon the kind of inconsistency in the jury verdicts at issue in *Sharp*, 227 Wis. 2d at 18–19.

¶ 62. Trooper Fouraker testified that the two rear tires of the Morden vehicle had drawn his attention. The failed tires were the unique thing he saw in his investigation. Accident reconstruction expert Shaw concluded that the two failed tires had undergone a belt separation. According to tire expert Taylor, a degeneration of the adhesion between the radial belts caused the separation.

¶ 63. Taylor hypothesized that the adhesion problems occurred either in the manufacturing process or in the operation of the tires. He described potential manufacturing difficulties ranging from excessive heat to inadequate materials, to dust.[10] Taylor acknowl-

---

[10] During the trial, Taylor testified:

In the manufacturing process it depends on the control of the materials involved, whether they are correctly formulated, whether they are processed properly. If they are processed too hot, what can happen is your coating, the rubber on here, if it's too hot, the material starts to cure prematurely and then when you build the tire, bond it together, it doesn't bond properly. Instead of getting the meld together, they will not meld properly and they will during the life of the tires cause separation.

Conversely, if the material, if it's a tire that's not built often, a lot of times some of the materials have been gathered. Because all the components come from different stations around the plant, if they age too long, they start to cure. Again, with the same results, lack of

edged that post-manufacturing problems, including the operation and maintenance of the tires, also could have affected adhesion. These problems included heat, age, speed, and overinflation of the tires. More than one factor could have affected adhesion. These problems were foreseeable, whether the adhesion problems began before or after the tires left the Continental plant. Taylor stated that each tire was defective because "the adhesive stem splice wasn't sufficient to take care of the tire during its life."

¶ 64. The two failed tires were made in the same plant at the same time. They were identical in design. The tires failed at the same time in exactly the same way—the cap ply around each tire split at the same spot, the cap ply splice.

¶ 65. Taylor testified that the belt separations in the two tires were of long-term duration. Hence, the jury could have concluded that the separations did not occur on the date of the accident because of speed or the dip in the highway. The speed of the Vanagon, the weight it was carrying, the highway dip, and other factors simply exacerbated the intense pressure that the already separated belts were putting on the "only structure[s] that [were] really left holding the tire[s] together," namely, the single wrap cap plies. As a result, they came apart, and the tires ruptured.

¶ 66. Taylor attributed the belt separation to Continental's use of the single-wrap cap splice. The

knitting of the two belts properly. So aging is another property. Just plain collecting dust. All these things should be covered. The materials should be covered in the manufacturing process because it gets dust on it. Anything that can contaminate the surface will lead to separation problems, and then the integrity of the other components is important because you have to protect this area. The material needs to have protection of antioxidants in it, and antioxidants are chemicals that retard the influence of oxygen on rubber.

tires blew out because the "cap ply splice was not strong enough to hold the tire together." Taylor therefore concluded that tires would not have failed had Continental used the double-wrap cap splice.[11]

¶ 67. Similarly, the deposition of a Continental employee, read to the jury at trial, could have led the jury to infer that the tires would not have ruptured but for the failure of the single-wrap cap splice and the ensuing belt separations. Continental's quality control engineer, Victor Bleumel, observed that both tires split open at the weak juncture of the cap ply splice. Bleumel inspected the tires by way of physical and x-ray examination, and he found bubbles inside the tires that coincided with the area of the belt separation. He stated that the belt separation was a cause, "one factor," contributing to the failure of both rear tires and agreed that the tires probably would not have failed absent the separation.

¶ 68. The failure of both rear tires simultaneously at exactly the same points within the tires buttressed tire expert Taylor's belief that a design or manufacturing defect caused the tire failure. Morrie Shaw, the Mordens' accident reconstruction expert, also testified that the simultaneous rupture of the tires precipitated the vehicle's loss of control. Similarly, the director of quality assurance for Continental, Dr. Rainer Stark, indicated that belt separations lead to

---

[11] Counsel for Continental conceded at trial that John Taylor's testimony supported the conclusion that belt separations caused the tires to fail: "I can assure the Court that there is an enormous amount of testimony from Mr. Taylor on that very point, that there are belt separations, that the separations are what caused the tires to come apart when it hit the bump. The record is replete in those references."

tire failure, and the sudden failure of two tires simultaneously posed an increased risk of danger.

¶ 69. Mr. P's tire consultant, Donald Avila, presented conflicting testimony. He stated that "the tires had nothing to do with" the Mordens' accident, arguing that "the driver did something improper that caused the driver to lose control of the vehicle." Notwithstanding this testimony, we usually uphold a jury verdict when credible evidence supports that verdict, even if that evidence is contradicted by stronger and more convincing evidence. *Weiss*, 197 Wis. 2d at 388–90.

¶ 70. Continental contends that a claim for negligent manufacture or design cannot prevail "solely on the failure of the tires" when the plaintiff "failed to exclude other potential causes." It argues that the design of the tires does not give rise to an inference of negligence because other factors, such as the age of the tires and their misuse, were not eliminated as causes of the accident. For instance, Continental maintains that the manner in which the Mordens loaded the vehicle, overinflated its tires, and drove the vehicle caused the Vanagon to bottom out and led the tires to fail simultaneously.

¶ 71. We disagree for two reasons. First, the standard of review in this case requires us to accept the inferences drawn by the jury unless those inferences are completely speculative and unfounded. They are not. The jury heard ample evidence that the Mordens may have misused the Vanagon. The Mordens' own experts, Taylor and Shaw, testified that Thomas Morden purchased the wrong tires for the Vanagon, and Taylor conceded that this constituted misuse of the tires. The Tech Lube employee who serviced the vehicle explained that the tires were overinflated three

months before the Mordens departed on their vacation, and Thomas Morden himself conceded that he did not check the tire pressure personally. Taylor agreed that overinflation could contribute significantly to the loss of adhesion between the belts. But the jury also heard expert testimony that minimized the effect of these factors.

¶ 72. The jury's answers to the two Special Verdict questions about Thomas Morden's negligence suggest that the jury did not exclude other factors leading to the accident. To answer those questions, the jury must have pondered testimony that the Continental tires were not the proper ones for the Vanagon, that the tires may have been overinflated, that Thomas may have overloaded the vehicle, and, perhaps, that he did not secure the Hobie Craft well enough to prevent the trailer from swaying. The jury factored this evidence into the equation because it determined that Thomas Morden was negligent in the selection or maintenance of the tires. The jury did not conclude, however, that his negligence was a cause of the accident. These conclusions contradict the suggestion that the jury failed to consider causes other than the negligent design and manufacture of the tires.

¶ 73. Second, product misuse, whether in the maintenance or operation of a vehicle, speaks to the affirmative defense of contributory negligence. *Schuh*, 63 Wis. 2d at 740–41. A negligence claim does not turn on a plaintiff's ability to exclude other possible causes, and a finding of negligence does not necessarily address the only cause of an accident. Accidents, as Judge Wasielewski remarked, can have more than one cause, and plaintiffs are not required "to show freedom from their own negligence as part of their own case."

Instead, "If they were negligent, it's the job of the defendant to allege contributory negligence and to prove it."

¶ 74. The jury in this case did not attribute the sole cause of the accident to Continental's negligence. Rather, it discerned that more than one cause led to Christine Morden's injuries. The jury found Christine Morden negligent with respect to her operation of the vehicle and determined that her negligence was a cause of the accident. Thus, the jury apparently considered witness Leonhard's testimony that the Vanagon was traveling at a speed of about 72 miles per hour and changing lanes abruptly, and it may have taken into account tire consultant Avila's opinion that the driver of the vehicle did something improper that caused the Vanagon to lose control.

¶ 75. The jury is free, as it did here, to assign a percentage of responsibility to the plaintiff for the harm he or she sustained because apportionment of negligence usually is a question of fact for the jury. *See Peters v. Menard, Inc.*, 224 Wis. 2d 174, 193, 589 N.W.2d 395 (1999). The contributory negligence statute does not bar recovery to a plaintiff whose percentage of causal negligence is less than 51 percent. Wis. Stat. § 895.045. The jury apportioned 50 percent of the negligence to Continental and the other 50 percent to Christine Morden. Consequently, the statute does not preclude Christine Morden from recovering damages.

¶ 76. The jury was unanimous in its decision that Continental's negligence was a cause of the accident. Viewing the evidence in a light most favorable to the jury's verdict, we believe that a jury could infer that Continental's failure to implement the double-wrap

cap splice design was a substantial factor in the accident and constituted a cause-in-fact of Christine Morden's injuries.

¶ 77. Our review of the negligence claim concludes by addressing briefly the fourth element of the analysis, namely proof that an actual loss or damage resulted from the accident. The Mordens presented abundant evidence of the actual losses they sustained. As the trial court observed, "[t]he damages here could be fairly termed as catastrophic." A good share of the testimony by Thomas and Christine Morden focused on the debilitating nature of Christine's injuries and the care she requires. We have no doubt that the record supports the jury's finding that Christine, a quadriplegic, sustained an actual loss.

¶ 78. Considering the evidence in a manner that is most favorable to the jury's verdict, we conclude that the record reveals credible evidence to sustain the jury's determination that Continental was negligent in the design or manufacture of the tires. Under any reasonable view of the evidence, the jury could have inferred that the Mordens satisfied the burden of proving each of the four elements of the negligence claim. This is not a case in which there was a complete failure of proof that would lead us to find that the jury must have based its verdict on impermissible speculation or conjecture. We therefore uphold the judgment of the circuit court that approved the verdict of the jury and reverse the court of appeals.

¶ 79. Because we reverse the court of appeals on this first issue, we do not reach the Mordens' second alternative issue, namely the finding of the circuit court that the strict liability verdict was defective. Similarly, we do not address the third issue presented by

the Mordens that asked us to consider the situations in which the court of appeals may file unpublished, per curiam opinions.

## CONTINENTAL'S REQUEST FOR A NEW TRIAL

¶ 80. Having concluded that the evidence at trial was sufficient to sustain the determination of the jury, we now turn to the issue Continental presents to this court, namely whether Continental is entitled to a new trial because the exclusion of evidence of the covenant not to sue prejudiced the jury and resulted in an unfair trial. We conduct this analysis in two parts, first looking at the scope of a trial court's discretion in making evidentiary rulings and then turning to the circumstances under which this court will exercise its discretion to grant a new trial.

■■■

¶ 81. The standard for reviewing a circuit court's evidentiary ruling requires us to determine whether the court exercised its discretion appropriately. *Grube v. Daun*, 213 Wis. 2d 533, 542, 570 N.W.2d 851 (1997) (citing *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983)). In *Grube*, we commented that when we are asked to review evidentiary rulings, "we look not to see if we agree with the circuit court's determination, but rather whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record." *Id.* If the circuit court applied the proper law to the pertinent facts and provided a reasonable basis for its ruling, we will conclude that the court acted within its discretion. *Id.*; *see State v. Gray*, 225 Wis. 2d 39, 48, 590 N.W.2d 918 (1999). Here, we conclude that the circuit court's decision to exclude the evidence of the covenant was an appropriate exercise of its discretion.

¶ 82. Wisconsin Stat. § 904.08 governs the admission of evidence of a settlement or agreement. The statute provides:

> **Compromise and offers to compromise.** (1) Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This subsection does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, proving accord and satisfaction, novation or release, or proving an effort to compromise or obstruct a criminal investigation or prosecution.

This statute precludes the admission of settlement evidence to show liability or prove the invalidity of a claim at issue. The last sentence permits admission of settlement evidence if that evidence is offered for other enumerated purposes, but it does not require the admission of such evidence.

¶ 83. Consistent with this statute, a party may offer settlement evidence to prove the prejudice or bias of a witness.[12] *Anderson v. Alfa-Laval Agri, Inc.*, 209

---

[12] In *Anderson v. Alfa-Laval Agri, Inc.*, 209 Wis. 2d 337, 341, 564 N.W.2d 788 (Ct. App. 1997), the circuit court advised the jury that the plaintiffs had settled their claims with a series of defendants. The jury thereafter returned a verdict that Alfa-Laval Agri, Inc. was not negligent. The court of appeals concluded that the circuit court had erred by advising the jury of the plaintiffs' settlement with other defendants, but it did not

Wis. 2d 337, 350, 564 N.W.2d 788 (Ct. App. 1997) (citing *Hareng v. Blanke*, 90 Wis. 2d 158, 167–68, 279 N.W.2d 437 (1979)). The party may demonstrate prejudice or bias by showing that a witness changed his or her testimony or that the posture of a settling party was significantly different as a result of the settlement. *Id.*

¶ 84. In this case, Continental argued to the circuit court that the testimony of the accident reconstruction expert, Shaw, changed as a result of the settlement because Shaw did not testify about the crashworthiness of the VW Vanagon. In response, the circuit court examined the last sentence of the rule and reasoned that there was no showing of witness bias by a change in testimony; rather, "[t]he only thing that's been shown is the testimony has been omitted." After all, the court said, it was not appropriate for Shaw to testify about crashworthiness when no question about crashworthiness was put to him. Thus, the court allowed mention of the covenant only for the purposes of showing bias insofar as the testimony of a witness had changed. This colloquy demonstrates that the circuit court exercised its discretion appropriately by applying the proper law to the pertinent facts and by offering a reasonable basis for its conclusions.

¶ 85. Continental argues that the circuit court misconstrued the rule by reading it too narrowly. Continental maintains that Wis. Stat. § 904.08 should be read expansively to include the admission of settlement evidence for purposes other than those enumerated in the last sentence. Section 904.08 is a modification of Federal Rule of Evidence 408. The third sentence of § 904.08 is more expansive than Federal

---

reverse the court because "there is sufficient evidence for the jury to conclude that Alfa-Laval was not negligent."

Rule 408 in that it adds the phrase "proving accord and satisfaction, novation or release" to the list of the enumerated purposes that justify the admission of settlement evidence. The Judicial Council Committee's Note to Rule 904.08 cites cases that "admonish trial courts to be cautious in determining admissibility." 59 Wis. 2d at R91 (1973). Because the purposes enumerated in our rule already go beyond Federal Rule 408, § 904.08 should not be expansively construed. *See also In Matter of Estate of Ruediger*, 83 Wis. 2d 109, 127, 264 N.W.2d 604 (1978). Consequently, this court would find it hard to overrule a circuit judge who thoughtfully articulated a narrow construction of the rule.

¶ 86. Continental also relies on *Johnson v. Heintz*, 73 Wis. 2d 286, 243 N.W.2d 815 (1976), a case in which this court concluded that "the trial court should have allowed appellants to identify which insurance companies were aligned with which parties and to further introduce the fact of settlement" to the jury. *Id.* at 300. Despite this observation, *Johnson* cautioned that admission of evidence pertaining to settlement details would undermine the purpose of § 904.08 and render the statute meaningless. Moreover, although the last sentence of § 904.08 *authorizes* circuit courts to admit settlement evidence under certain circumstances, the rule does not *require* a court to admit that evidence. Thus, when parties have the opportunity to question the consistency of a witness's testimony, the exclusion of settlement evidence "can in no way be prejudicial." *Id.* at 301. In such cases, the error does not warrant sanction of a new trial. *Id.*

¶ 87. Having considered the discretion of the circuit court in making evidentiary rulings, we now turn to the circumstances under which this court will con-

sider granting a new trial. This court approaches a request for a new trial with great caution. *Grube*, 213 Wis. 2d at 553. We are reluctant to grant a new trial in the interest of justice, and thus we exercise our discretion only in exceptional cases. *Gonzalez*, 137 Wis. 2d at 133; *State v. Friedrich*, 135 Wis. 2d 1, 35, 398 N.W.2d 763 (1987). Where, as here, the circuit court has denied the parties' motion for a new trial, we recognize that "a circuit court is in a better position than an appellate court to determine whether confidence in the correctness of the outcome at the original trial or hearing has been undermined." *State v. McCallum*, 208 Wis. 2d 463, 491, 561 N.W.2d 707 (1997) (Abrahamson, C.J., concurring).

¶ 88. Bearing this cautionary approach in mind, we concurrently acknowledge the inherent and express authority that this court has to review requests for a new trial independently. *See id.* at 491 n.13; *Grube*, 213 Wis. 2d at 553. In determining whether parties are entitled to a new trial, this court "is not strictly limited by its erroneous exercise of discretion" standard of review. *McCallum*, 208 Wis. 2d at 491 n.13 (Abrahamson, C.J., concurring). Rather, Wis. Stat. § 751.06 grants us the authority to "direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial" in a discretionary review of the case. *Id.*; Wis. Stat. § 751.06. Under § 751.06, this court may grant a new trial under one of two prongs: If (1) "it appears from the record that the real controversy has not been fully tried;" or (2) "it is probable that justice has for any reason miscarried."[13]

---

[13] The statutes extend the same discretionary authority to the court of appeals. Wis. Stat. § 752.35. We have held that with respect to "the discretionary power to reverse under secs. 751.06

¶ 89. We turn then to the first statutory prong and address whether the record reveals that the real controversy in this case was not fully tried. This court has recognized that there are two circumstances under which it is possible that the real controversy has not been fully tried: (1) "when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case;" and (2) "when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried." *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996).

¶ 90. In this case, Continental questions the decision of the circuit court to exclude the evidence of the covenant not to sue. We examine Continental's request for a new trial, beginning with the first possible circumstance of the first prong, namely that the jury was not given the opportunity to hear important testimony that bore on an important issue in this case. We find that the exclusion of the VW agreement did not diminish the jury's ability to hear testimony.

¶ 91. This case is distinguishable from those situations in which this court previously has found that the exclusion of evidence prevented a full trial of the real controversy. In *Hicks*, 202 Wis. 2d at 172, we held that a defendant in a sexual assault case was entitled to a new trial because the real controversy, which centered on the defendant's identity, had not been fully tried. In *Hicks*, the defense counsel failed to secure the DNA evidence that could have excluded the defendant as the donor of a hair specimen critical to the identification of the assailant. *Id.* at 152, 157. The DNA

and 752.35 the powers of the supreme court and the court of appeals are coterminous." *Vollmer v. Luety*, 156 Wis. 2d 1, 18, 456 N.W.2d 797 (1990).

evidence, we concluded, bore substantially on the defendant's identity and therefore obscured an issue crucial to the case. *Id.* at 161.

¶ 92. The identity of the defendant was also at issue in *Garcia v. State*, 73 Wis. 2d 651, 245 N.W.2d 654 (1976). A witness identified Richard Garcia as the person who had been present at a shooting. *Id.* at 653. At trial, Garcia denied his presence and provided an alibi but did not disclose that a friend actually participated in the incident and that the friend would have testified that Garcia was not involved in the crime. *Id.* at 654. In granting a new trial, we held that the identification of the defendant and his alibi were central to the dispute and that the testimony of the participating friend therefore was "very material and significant." *Id.* at 655–56.

¶ 93. In *State v. Cuyler*, 110 Wis. 2d 133, 327 N.W.2d 662 (1983), a sexual assault case, the central issue hinged on the credibility of the defendant vis-à-vis the credibility of the victim. The defendant in *Cuyler* testified on his own behalf, and his attorney attempted unsuccessfully to introduce the testimony of police officers who could address the defendant's character. *Id.* at 136. We held that the real controversy was not fully tried because the circuit court excluded critical testimony about credibility, a determinative issue in the case. *Id.* at 141.

¶ 94. Generally, this court does not grant a new trial unless it finds that the exclusion of the evidence "so clouded a crucial issue" that it prevented the jury from reaching a fair and just result. *Hicks*, 202 Wis. 2d at 160. The facts of this case do not present the type of exceptional circumstances that clouded the issues in *Hicks*, *Garcia*, or *Cuyler*. Our decision to grant new trials in those cases bore immediately on the central,

sole issue at hand. Here, evidence concerning the VW agreement did not go to the central issue in this case or prevent this case from being fully tried. We therefore find that under the first prong of the statutory test, this case does not present circumstances so exceptional that they warrant a new trial.

¶ 95. We next consider the second statutory prong for a new trial, under which this court may exercise its discretion to grant a new trial when "it is probable that justice has for any reason miscarried." To grant a new trial in the interest of justice, we must find that "there has been an apparent miscarriage of justice and it appears that a retrial under optimum circumstances will produce a different result." *Garcia*, 73 Wis. 2d at 654. Thus, unlike the first statutory prong, this second prong requires an appellate court to find that there is a substantial probability of a different result on retrial. *Vollmer*, 156 Wis. 2d at 16–17, 19.

¶ 96. We are not persuaded that admission of the evidence in this case would, under optimum circumstances, have produced a different result. In Wisconsin, our established case law provides that a covenant not to sue does not affect a nonsettling joint tortfeasor. *Imark Indus., Inc. v. Arthur Young & Co.*, 148 Wis. 2d 605, 622, 436 N.W.2d 311 (1989). Rather, the whole cause of action simply remains against the nonsettling defendants. *Id.* The nature of the case against Continental did not alter as a result of the VW agreement.

¶ 97. Our review of the record does not reveal that admission of the VW agreement would have yielded a different result at trial. Even under optimum circumstances, it is not clear that the agreement with VW, the manufacturer of the vehicle, had any impact on the determination of the jury that Continental was negligent in the design or manufacture of the tires.

¶ 98. Continental argues that by failing to disclose the agreement, the circuit court deprived Continental of its opportunity to impeach the Mordens' witnesses. In particular, Continental points to the bias created by the fact that Shaw, the reconstruction expert, did not testify about the Vanagon's crashworthiness. We disagree. Shaw's pretrial opinions about the vehicle were before the circuit court, and Continental's lawyers could have asked Shaw whether he thought the roof or the tires caused the injuries.[14] At trial, Shaw testified that the roof of the Vanagon caved in, and Continental's lawyers could have used that testimony to probe into more about the vehicle.

¶ 99. Continental has not shown that admission of the VW agreement evidence would have produced a different result at trial. On the contrary, admission of the evidence could have had a prejudicial effect by implying that the Mordens had reached a monetary settlement with one defendant, making it less compelling to find in their favor as against Continental.[15] We therefore conclude that Continental has not satisfied the second statutory prong for a new trial.

¶ 100. The circumstances under which this court will exercise its discretion to grant a new trial are exceptional. *Hicks*, 202 Wis. 2d at 161. Taking into

---

[14] As the trial court remarked: "It's a basic law of evidence, though, that you can put in evidence for your case on cross-examination of somebody else's witness. It's done all the time."

[15] "Introducing settlement evidence is a potentially incendiary device, one that could lead the jury to conclude that the plaintiffs have received ample compensation from the real malefactors and no further recovery is necessary." Daniel J. LaFave, *The Admissibility of Settlement Evidence in Multidefendant Tort Cases*, Wisconsin Lawyer (June 1998).

account the appropriate discretion exercised by the trial court in its review of this evidentiary issue, we are not persuaded that this case presents circumstances exceptional enough to overcome our usual reluctance to grant a new trial.

## CONCLUSION

¶ 101. In conclusion, we hold that the record contains sufficient, credible evidence to sustain the jury's determination that Continental was negligent in the design or manufacture of the tires. We further hold that Continental is not entitled to a new trial on the basis of the exclusion of the evidence of the covenant not to sue.

*By the Court.*—The decision of the court of appeals is reversed.